**Jeffrey M. Edelson, OSB # 880407**
JeffEdelson@MarkowitzHerbold.com
Nathan D. Burcham, OSB #182509
NathanBurcham@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Tel: (503) 295-3085
Fax: (503) 323-9105

**Kelly K. Simon, OSB # 154213**
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240
Tel: (503) 227-6928

**Nicholas S. Cady, OSB # 113463**
nick@cascwild.org
CASCADIA WILDLANDS
PO Box 10455
Eugene, OR 97440
Tel: (541) 434-1463
Fax: (541) 434-6494

**Elisabeth Holmes, OSB # 120254**
eli@willametteriverkeeper.org
WILLAMETTE RIVERKEEPER
PO Box 293
Eugene, OR 97440
Tel: (541) 870-7722

        Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES, WILLAMETTE RIVERKEEPER, CASCADIA WILDLANDS, NEIGHBORS FOR CLEAN AIR, AND 350PDX,<br><br>                    Plaintiffs,<br><br>         vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his capacity as Acting Secretary, U.S. Department of Homeland Security, | No.    3:20-cv-1816<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violations of Administrative Procedure Act and National Environmental Policy Act, 5 U.S.C. §§ 701 *et seq.*, 42 U.S.C. §§ 4321 *et seq.*, 40 C.F.R. §§ 1500-1508) |

Defendants.

## INTRODUCTION

1.      Human health and environmental health are inextricably linked.  This case seeks to ensure that the federal government informs the public about environmental and human health impacts of Operation Diligent Valor as required by the National Environmental Policy Act (NEPA) and related rules.

2.      Like other basic human rights, the rights to health and a healthy environment is disproportionately denied to Black, Indigenous, and other people of color in the United States. Environmental justice is also racial justice.

3.      The Minneapolis, Minnesota police gratuitously killed George Floyd on May 25, 2020.  That was just two months after police officers in Louisville, Kentucky burst into Breonna Taylor's home and shot her eight times while she lay in her own bed.  As public attention has grown on the violent and systemic racism in American policing, protests have erupted worldwide.  Locally, this includes Portland, Oregon, the traditional land of Chinook, Clackamas, Cowlitz, Kalapuya, Kathlamet, Molalla, Multnomah, Tualatin, and Wasco Tribes ("Portland"). Thousands of people have gathered nearly every night in Portland to mourn the loss of Black lives, demand an end to racist and brutal policing practices, and call for new visions of public safety that value Black lives.  These protests continue to the present day.

4.      The Department of Homeland Security (DHS) planned to quell said protests in Portland in an action called "Operation Diligent Valor."

5.      As part of Operation Diligent Valor, Defendants and their agents are subjecting people at or near the protests to a vast arsenal of weapons including but not limited to rubber bullets, tear gas and other chemical munitions,[1] impact munitions, marking munitions, rubber ball blast devices, flash bangs, baton strikes, a long-range acoustic device, and other military-

---

[1] The term "tear gas and other chemical munitions" is used throughout this complaint to encompass all forms of noxious gas and other chemical weapons used for crowd control, including but not limited to CS gas, which is the most commonly used type of tear gas, OC gas, HC smoke, and pepper balls.  Limited information about specific chemical compounds and risks to human and environmental well-being are publicly available from the weapons manufacturers.

style weapons and tactics.  Collectively, these weapons are referred to herein as "tear gas and other munitions", "munitions", or "weapons".

6.     Defendants and their agents have used tear gas and other munitions on demonstrators near the Willamette River as recently as October 17-18, 2020.  A video from this time period of Defendants and their agents using what appears to be a thermal fogger[2] to emit tear gas or another chemical munition at people throughout the South Waterfront neighborhood can be viewed here: https://tinyurl.com/fogger-gas-Oct2020.



*Image above shows the device appearing to be a thermal fogger as referred to above.*

7.     On multiple occasions, Defendants and their agents, specifically targeted tear gas and other chemical munitions at people of all ages and genders standing in groups that explicitly include and support Black lives, at journalists and legal observers attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters.  And sometimes there was no escape route for people to get away from the chemical clouds.

---

[2] The video and images in this paragraph capture a recent, but not the first, time Defendants have used the "thermal fogger" device.

8.     Tear gas and other chemical munitions from Operation Diligent Valor have also infiltrated nearby residences, federal and local government buildings, businesses, and parks.

9.     Tear gas and other chemical munitions from Operation Diligent Valor may also have permeated Portland's vegetation.

10.    The manner and volume of tear gas and other munitions deployed in relation to Operation Diligent Valor in Portland has been so excessive and substantial that visible munitions residue and sediment[3] have accumulated in and on Portland's streets, sidewalks, curbs, bioswales, stormwater system, buildings, and standing water, and have been transported and conveyed to the Willamette River banks and waters.

11.    The Willamette River in Portland is a tidally influenced navigable waterway used for recreation, including boating, swimming, fishing, wildlife and plant viewing, bird-watching, walking, biking, and hiking.

12.    The Willamette River and its ecosystem  provide habitat to many types of terrestrial, avian, and aquatic wildlife, and is a federally designated critical habitat for threatened salmonids and steelhead.

13.    The Willamette River and its ecosystem support important Indigenous cultural resources.

14.    The weapons Defendants and their agents used and are using for Operation Diligent Valor present potentially grave health and environmental hazards.  And Plaintiffs and the public have a right to know about those risks.

15.    People subjected to Defendants' actions and weapons include Plaintiffs Northwest Center for Alternatives to Pesticides (NCAP), Willamette Riverkeeper, Cascadia Wildlands, Neighbors for Clean Air, and 350PDX and their members and supporters (collectively "Plaintiffs").

16.    Plaintiffs bring this civil action for declaratory and injunctive relief brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and allege violation of the

---

[3] Residue and sediment include actual munition pieces and parts, as well as residual chemical residue and other particles that concentrate on surfaces and in water.

National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, its implementing regulations, 40 C.F.R. §§ 1500-1508, and DHS policies.

17.     When engaging in major federal actions like Operation Diligent Valor, NEPA obligates Defendants to prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), to adhere to its own emergency protocols contained in its DHS Instruction Manual 023-01-001-01, Revision 01, "Implementation of the National Environmental Policy Act" (Nov. 6, 2011) ("DHS NEPA Instruction Manual"), and to follow the Council for Environmental Quality's ("CEQ") Emergencies Memorandum for Heads of Federal Departments and Agencies: Emergencies and the National Environmental Policy Act (May 12, 2010) ("CEQ Emergencies Memorandum").

18.     To Plaintiffs' knowledge, Defendants have not prepared an EA or EIS, have not adhered to the DHS NEPA Instruction Manual, nor have Defendants followed the CEQ Emergencies Memorandum for Operation Diligent Valor and its related actions.

19.     In short, NEPA required Defendants to consider the potentially severe environmental and human health impacts of Operation Diligent Valor, but they did not do so. And they continue to abdicate that responsibility to Plaintiffs and the public.

20.     Plaintiffs seek a declaration that Defendants failed to perform their legal duties under NEPA and injunctive relief to cure Defendants' failures.

## JURISDICTION

21.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant), 2201 (injunctive relief), and 2202 (declaratory relief).  Plaintiffs' claims arise under the laws of the United States, including the APA and NEPA.  An actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

## VENUE

22.     Venue in this Court is proper under 28 U.S.C. § 1391(e) because Plaintiffs are headquartered in this District and conduct activities in this District, and all or a substantial part

events or omissions giving rise to the federal claims herein occurred within this judicial district, and more specifically at this very courthouse.

23.     Venue is proper in the Portland Division per Local Rule 3-2(a)(1).

24.     Defendant Chad Wolf is the Acting Secretary for the U.S. Department of Homeland Security. Defendant U.S. Department of Homeland Security is a department of the United States government and has its Oregon office in Portland. Defendant U.S. Department of Homeland Security has several agencies, offices, or components, including the U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, Federal Protective Service, and the Transportation Security Administration.

## PARTIES

25.     Plaintiff Northwest Center for Alternatives to Pesticides ("NCAP") is a 501(c)(3) and Oregon environmental non-profit organization with approximately 50,000 supporters, about 7,000 of whom live in the Portland Metro area. NCAP works to protect community and environmental health from the detrimental effects of pesticides and chemicals in the Pacific Northwest. Through research, education and advocacy, NCAP advances the use of ecologically sound alternatives to pesticides and chemicals. NCAP has members, officers, and staff who live in, work in, or visit the Portland Metro area where federal agents have repeatedly deployed tear gas and other chemical munitions against protesters. The prolonged employment of unknown chemicals by federal agents in Portland, without first conducting an environmental impact study, affects NCAP's ability to protect community and environmental health and to provide to its supporters science-based information about the chemicals. *See* Declaration of Ashley Chesser, NCAP Executive Director ("Decl. Chesser"); see also Declaration of Dominica Navarro ("Decl. Navarro").

26.     Plaintiff Willamette Riverkeeper is a 501(c)(3) and an Oregon non-profit corporation headquartered on the Willamette River in Portland, Oregon. Willamette Riverkeeper serves as the eyes, ears, and voice of the Willamette River. For more than 20 years, the organization's sole mission has been to protect and restore the Willamette River's water quality, habitats for wildlife and aquatic species, and resources. Willamette Riverkeeper believes that a

river with good water quality and abundant natural habitat, safe for fishing and swimming, is a basic public right.  Willamette Riverkeeper engages in public outreach and education, advocacy with agencies, agency administrative processes, habitat restoration, Superfund cleanup, Clean Water Act compliance, and where necessary, litigation.  Willamette Riverkeeper brings this action on behalf of itself and its affected staff, and its nearly 7,000 members and supporters.  See Declaration of Travis Williams, Willamette Riverkeeper's Executive Director ("Decl. Williams"); see also Declaration of Juniper Simonis ("Decl. Simonis"); Declaration of Gordon Noble.

27.    Plaintiff Cascadia Wildlands is a non-profit corporation headquartered in Eugene, Oregon that educates, agitates, and inspires a movement to protect and restore Cascadia's wild ecosystems.  Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion.  Cascadia Wildlands organization defends our communities in the forests, in the courts, and in the streets.  See Declaration of Josh Laughlin, Cascadia Wildlands Executive Director ("Decl. Laughlin"); see also Declaration of Brenna Bell ("Decl. Bell").

28.    Plaintiff Neighbors for Clean Air ("NCA") is an Oregon environmental nonprofit with several thousand members and supporters, most of whom live in Oregon.  NCA advocates for better air quality in Oregon with an emphasis on public health, and empowers Oregonians with information and tools to ensure everyone breathes clean air.  NCA has four thousand members, officers, and staff who live in, work in, or visit the Portland Metro area where federal agents have repeatedly deployed tear gas and other chemicals against protesters.  Extended use of unknown toxic chemicals by federal agents in Portland, without first conducting an environmental impact study, affects its ability to protect community health and provide information about risk to its members.  See Declaration of Mary Peveto, NCA's Executive Director ("Decl. Peveto"); see also Declaration of Lisa Leithauser ("Decl. Leithauser"); Declaration of Kristin Teigen ("Decl. Teigen").

29.    Plaintiff 350PDX ("350PDX") is a 501(c)(3) nonprofit whose mission is to build a diverse grassroots movement to address the causes of climate change through justice-based

solutions by inspiring, training, and mobilizing people to act.  350PDX works at the intersection of climate justice, environmental justice, and racial justice in support of diverse frontline communities most disproportionately impacted by climate change and fossil field development. 350PDX is a grassroots, volunteer-led organization working on advancing climate justice, divestment of fossil fuels, and disrupting the status quo of corporate-owned energy systems. 350PDX has over 8000 members and supporters throughout the Portland metro region, and over 200 active volunteers who participate in trainings, protests, marches, public hearings, and other forms of civic engagement.  See Declaration of Indigo Namkoong ("Decl. Namkoong"); Declaration of Jamie Pang-South.

30.     Plaintiffs' injuries are actual, concrete, particularized injuries caused by Defendants' failure to comply with mandatory duties under federal laws.  These injuries would be redressed by the relief sought.

31.     Defendant Department of Homeland Security ("DHS") is an executive agency of the United States whose stated mission is to "safeguard the American people, our homeland, and our values."  Defendant DHS was established in the wake of 9/11 to address the United States' vulnerability to terrorist attacks.  Defendant DHS's agencies, offices, or components include U.S. Customs and Border Protection (CBP) and the Border Patrol Tactical Unit (BORTAC), U.S. Immigration and Customs Enforcement (ICE), and the Federal Protective Service (FPS).

32.     Defendant Chad Wolf is the purported Acting Secretary for the Department of Homeland Security, and he is sued herein in that official capacity.

## LEGAL BACKGROUND

### National Environmental Policy Act

33.     Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that "significantly affect the quality of the human environment."  42 U.S.C. § 4332(2)(C).

34.     NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to challenge the agency's action.

35.      The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies.  42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq.*

36.      Human health impacts must be considered in the NEPA process.  40 C.F.R. § 1508.8(b).

37.      NEPA requires federal agencies to prepare an environmental impact statement (EIS) for any "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

38.      An EIS is a "detailed statement" that must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332.

39.      When it is not clear whether an action requires the preparation of an EIS, the regulations direct agencies to prepare a document known as an Environmental Assessment ("EA") in order to determine whether an EIS is required.  40 C.F.R. §§ 1501.4(b), 1508.9.  An EA is a "concise public document" that must "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a).  An EA "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).

40.      If, based on an EA, an agency determines that an action may have a significant environmental impact, the agency must prepare an EIS.  40 C.F.R. § 1501.4(c).  If the agency determines that the impacts will not be significant, the agency must prepare a Finding of No Significant Impact ("FONSI").  40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.13.

41.     "Major federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  This includes "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies." *Id*.  Federal actions also include "actions to implement a specific policy or plan" or "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." *Id.*

42.     "Significantly" as used in NEPA requires consideration of both context and intensity, 40 C.F.R. § 1508.27.  "Context" means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action. 40 C.F.R. § 1508.27(a).  "Intensity" refers to the severity of the impact, and responsible officials should consider ten factors in evaluating intensity.  40 C.F.R. § 1508.28(b)(1)-(10).

43.     DHS NEPA Instruction Manual provides that an EIS is "normally" required when an action includes "activities where the effects on the human environment are likely to be highly controversial in terms of environmental impacts or involve unique or unknown environmental risks."  DHS NEPA Instruction Manual at V-14; *see also* 40 C.F.R. § 1508.27(b)(4) ("[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial" is a factor an agency must consider in evaluating the intensity of its actions).

44.     Other "intensity" factors include, in part, "[t]he degree to which the proposed action affects public health or safety", "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks", [t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration", "whether the action is related to other actions with individually insignificant but cumulatively significant impacts", "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973", and "[w]hether the action

threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(2), (5), (6), (7), (9), (10).

45.      Even in the event of an emergency, an agency must consider whether an action will have significant environmental impacts prior to acting.  40 C.F.R. § 1506.11.  In an emergency context, NEPA requires federal agencies to consult with CEQ regarding alternatives to the proposed action, and to limit agency actions to those necessary to control the immediate impacts of the emergency.  *Id.*

46.      Defendants' NEPA Instruction Manual Emergency Protocols require the agency to, prior to acting, (1) consider probable environmental consequences of its actions and to mitigate those consequences to the fullest extent possible; (2) determine the applicability of NEPA; (3) notify or seek approval from the Sustainability and Environmental Programs; and (4) determine the appropriate NEPA analysis.  DHS NEPA Instruction Manual at VI-1.

47.       The CEQ Emergencies Memorandum requires the preparation of a focused, concise EA even if the emergency action is not expected to have significant environmental impacts.  CEQ Emergencies Memorandum, Attachment 1.  If the action is likely to have significant environmental impacts, Defendants can determine whether an existing EA covers the proposed action; if there is no existing EA, Defendants may consult with CEQ about the potential for "alternative arrangements" to replace an EIS.  *Id.*

**Administrative Procedure Act**

48.      Judicial review of federal agency action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.  Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

///

///

///

///

Page 11 - COMPLAINT

## FACTUAL BACKGROUND

### Operation Diligent Valor's Context

49.     The months of sustained, repeated, high-volume use of tear gas and other chemical munitions like has occurred with Operation Diligent Valor in Portland is an alarming escalation of police tactics in response to people protesting in the United States.

50.     On June 26, 2020, in direct response to racial justice protests, the White House issued the "Executive Order on Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence."  Executive Order 13933 (85 Fed. Reg. 40081-40084 (Jul. 2, 2020)).

51.     Section five of the Executive Order states that "the Secretary of Homeland Security shall provide, as appropriate and consistent with applicable law, personnel to assist with the protection of Federal monuments, memorials, statues, or property."  Section five of the Executive Order is set to terminate six months from the date of the order, unless extended by the President.

52.     On July 1, 2020, in response to the Executive Order, Defendants established the Protecting American Communities Task Force (PACT) to "coordinate Departmental law enforcement agency assets in protecting our nation's historic monuments, memorials, statues, and federal facilities."

53.     Beginning on or around July 4, 2020, Chad Wolf, purported Acting Secretary of the U.S. Department of Homeland Security and the U.S.  Department of Homeland Security (collectively "DHS" or "Defendants") deployed approximately 114 law enforcement personnel and agents[4] in the City of Portland with the stated purpose of quelling protests of police brutality and protecting federal property.  The public has come to know this deployment and its related actions as "Operation Diligent Valor."

---

[4] On information and belief, the deployments include agents of several DHS sub-agencies, including Immigration and Customs Enforcement, Customs and Border Protection, Federal Protectives services, as well as agents of the U.S. Marshals Service, other public agencies, and potentially private entities.

54.     Defendants' law enforcement personnel and Defendants' agents deployed to
Portland include those of (1) Customs and Border Patrol (CBP), including the Border Patrol
Tactical Unit (BORTAC); (2) Immigration, Customs and Enforcement (ICE); and (3) Federal
Protective Services (FPS).

55.     Operation Diligent Valor is "entirely or partly financed, assisted, or conducted"
by Defendants.

56.     Operation Diligent Valor is subject to control by and is the responsibility of
Defendants.

57.     Portland protests frequently occur at the Multnomah County Justice Center
(the "Justice Center") in downtown Portland and the Immigrations and Customs Enforcement
Detention Center (the "ICE Detention Center").  The Justice Center is located at the corner of
Southwest Main Street and Southwest Third Avenue, directly across from the federal Mark O.
Hatfield Courthouse.  The ICE Detention Center is located on South Macadam Avenue, in the
South Waterfront neighborhood just southwest of downtown Portland along the Willamette
River.

58.     Operation Diligent Valor brought Defendants' agents and munitions to the areas
around the federal courthouse and the ICE Detention Center.

59.     The Justice Center is less than three blocks from the Willamette River and the
ICE Detention Center is less than two blocks from the Willamette River.

60.     Upon information and belief, there are at least seven stormwater drains in the
vicinity of the Justice Center and the ICE Detention Center.

61.     At least two of the stormwater drains in the vicinity of the Justice Center and the
ICE Detention Center convey directly to the Willamette River.

62.     When Defendants and Operation Diligent Valor arrived in Portland, the Portland
Police Bureau's (PPB) use of tear gas had already been curtailed.  Mayor Ted Wheeler had cited
"serious concerns about the use of CS gas for crowd management, particularly during a time
when we're battling a pandemic" in directing PPB to limit its use of tear gas.  Additionally, this
Court temporarily restrained PPB's use of tear gas to disperse crowds except where lives were

otherwise at risk. *Don't Shoot Portland, et al. v. City of Portland*, No. 3:20-cv-00917-HZ

(ECF No. 29 Order at  9-10) (D. Or. Jun. 9, 2020).

63.     On or around September 10, 2020, Portland Mayor and Police Commissioner

Ted Wheeler further directed PPB to fully cease the use of CS gas.

64.     Since their arrival sixteen weeks ago, Defendants' personnel and agents in

Portland have repeatedly, and over a sustained period of time, deployed tear gas and other

chemical munitions, including but not limited to CS gas, OC spray and HC smoke, and other

weapons.

65.     A video of Defendants deploying what appears to be HC smoke on July 16-17,

2020 outside the federal courthouse in downtown Portland can be viewed here:

https://tinyurl.com/HC-smoke-July2020.



*The image above shows a device used to emit what is believed to be HC smoke.*

66.     Defendants have fired these weapons repeatedly both downtown and in the South

Waterfront neighborhood.

**Page 14 - COMPLAINT**

67.     Defendants shot tear gas and other chemical munitions at people with little or no warning.

68.     Defendants shot tear gas and other chemical munitions at people in locations well beyond the federal property Defendants purport to protect in Operation Diligent Valor.

69.     Defendants have misused tear gas and other munitions by aiming them directly into crowds of people and by shooting tear gas canisters directly at individuals.  In one instance, Portland Mayor Ted Wheeler was in a crowd that Defendants shot with tear gas, and Mayor Wheeler stated that "he saw nothing which provoked this response."

70.     As part of Operation Diligent Valor, Defendants continue to engage demonstrators near the Willamette River with tear gas and other munitions despite Governor Kate Brown and Portland Mayor Ted Wheeler requesting federal officials leave.  Governor Kate Brown, Mayor Wheeler, Congressman Earl Blumenauer, Senator Ron Wyden, and other local officials have publicly denounced Defendants' presence and tactics in executing Operation Diligent Valor in Portland.

71.     Operation Diligent Valor and related events, including Defendants' use of tear gas and other munitions, have garnered sustained national attention, and have even been referred to in recent presidential debates.

72.     Operation Diligent Valor and related events have also garnered international attention, including international human rights bodies like the United Nations Human Rights Committee.

**Operation Diligent Valor's Impact on Human Health**

73.     Those exposed to, targeted with, and otherwise impacted by these weapons have included Plaintiffs, their staff, members, and supporters.

74.     A survey of the existing scientific literature on CS gas, a type of tear gas, by the U.S. National Research Council's Committee on Acute Exposure Guideline Levels (AEGL Committee) has indicated that there is no level of CS gas exposure that meets the AEGL Committee's "no effect" standard, or is consistent with the AEGL Committee's definition AEGL-1, in which effects are not disabling and are transient and reversible upon cessation of

exposure.  This indicates that even at low concentrations, CS gas presents a risk of irreversible or other serious, long-lasting adverse human health effects.

75.    According to publicly available weapons manufacturer safety data sheets, Defendants have repeatedly subjected people and wildlife (including aquatic species) in Portland to at least the following potential hazards of tear gas and other chemical munitions exposures:

a.  Cancer

b.  Fire

c.  Organ damage

d.  Aquatic toxicity for human and nonhuman organisms (acute and chronic)

e.  Skin and eye irritation

f.  Breathing difficulties

g.  Allergy or asthma symptoms

h.  Serious eye damage

i.  Rapid suffocation

76.    Tear gas and other munitions can be lethal.

77.    Defendants have even used expired tear gas and other chemical munitions canisters, manufactured as far back as 2000, on Portland demonstrators.

78.    Tear gas canisters expire roughly five years after their manufacture date. Information about expired tear gas indicates that the combustive mechanism in a tear gas canister can break down, causing gas to release more quickly and/or in higher concentrations than intended by the manufacturer.  The chemical composition of the tear gas may become more acutely toxic after the canisters expire.

79.    A strong chemical odor has lingered hours after Defendants' released tear gas and other chemical munitions.

80.    Beginning on July 28, 2020, protesters reported exposure to a potentially different gas that had a chlorine smell, a green-yellow color, and that exposure to that gas resulted in serious physical reactions like nausea, vomiting, and lasting headaches.

Page 16 - COMPLAINT

81.     Protesters have needed medical assistance for serious physical reactions to this gas.

82.     Plaintiffs and their staff, members, and/or supporters have experienced several of these effects.  See, e.g., Decl. Chesser; Decl. Navarro; Decl. Peveto; Decl. Teigen; Decl. Leithauser; Decl. Bell; Decl. Laughlin; Decl. Williams; Decl. Simonis; Decl. Namkoong.

83.     The Center for Disease Control states that exposure to large amounts of tear gas, particularly in closed settings, can lead to blindness, respiratory failure, and even death—in addition to the standard skin and eye irritation that the substance is designed to cause.  Other documented injuries from tear gas include lung, cutaneous, and ocular injuries, chronic pain, cough, asthma, lung injury, dermatitis, itch, and neurodegeneration.  There have been numerous reports of injuries and fatalities associated with exposure to high concentrations of tear gas or exposure in enclosed spaces or for extended periods of time.

84.     The U.S. Army moved to protect its own troops after a study published in 2014 showed that recruits exposed to tear gas in basic training had a nearly 2.5-times greater risk of being diagnosed with acute respiratory illness.  In this report, the authors described CS gas as having "a profound effect on the respiratory system, causing immediate pain and irritation in the nose and mouth, excessive nasal discharge and salivation, and sometimes violent coughing spasms, damage to the respiratory epithelium, and pulmonary edema" and that "CS-induced expectoration promotes the spread of pathogens responsible for [acute respiratory illnesses.]" In response to these findings, the Army mandated lower CS concentrations, shorter exposure times, semiannual industrial hygiene surveys, and periodic wet cleaning of all Army mask confidence chambers.

85.     Interviews by the Associated Press with medical researchers, federal regulatory agencies, and a review of U.S. government-funded scientific studies raise questions about the safety of the gas, especially its use on individuals in confined spaces, in excessive quantities, and when fired directly at protesters.  Medical professionals interviewed by the AP said the use of tear gas is particularly concerning during the COVID-19 epidemic.  Others cited the danger

posed when shifts in the wind cause the gas to migrate to non-target areas, including inside residences.

86.     The Associated Press also reported that there is no government oversight of the manufacture and use of tear gas.  Instead, the industry is left to regulate itself.

87.     The American Thoracic Society recently called for a moratorium on tear gas, citing the "lack of crucial research, the escalation of tear gas use by law enforcement, and the likelihood of compromising lung health and promoting the spread of COVID-19."  Tear gas leaves those exposed at a higher risk for contracting influenza, pneumonia, bronchitis, and other respiratory illnesses.

88.     Oregon Public Broadcasting recently interviewed over two dozen protesters who have provided examples of reproductive health impacts from CS gas, including uterine hemorrhaging and irregularities within their menstrual cycles.

89.     Members of Plaintiff organizations are reporting similar respiratory and/or reproductive health impacts after attending protests and being exposed to tear gas and chemical munitions.  See, e.g., Decl. Bell; Decl. Navarro; Decl. Teigen.

**Operation Diligent Valor's Impact on the Environment**

90.     Portland is located at an ecologically important crossroad where the Willamette and Columbia Rivers converge, facilitating dispersal of federally threatened salmonids deep into the heart of Oregon's Willamette River Basin.

91.     The volume of tear gas and other munitions deployed in relation to Operation Diligent Valor is so substantial that visible residue sticks to the streets, curbs, sidewalks, dirt, dust, and vegetation hours after Defendants' release of tear gas and other chemical munitions.

92.     City officials have recognized that residual chemicals, sediment from tear gas and other chemical munitions and weapon debris are settling into the city's storm drains in the downtown Portland area that lead to the Willamette River.

93.     City officials already identified residue, stormwater, and sediment in storm drains that could include chemicals such as total and dissolved metals (barium, chromium, copper, lead,

antimony, zinc), hexavalent chromium (including dissolved), perchlorate, chloride, cyanide, and semi volatile organic compounds (SVOCs).

94.    Plaintiffs and their members have identified instances of tear gas and other chemical munitions floating towards the Willamette River, and chemical munitions debris in the environment.  See, e.g., Decl. Simonis; Decl. Williams.

95.    The presence of chemicals, sediment, and munitions debris from Operation Diligent Valor in the Willamette River waters can cause negative effects to recreationalists, as well as wildlife (terrestrial, avian, and aquatic), and run contrary to the State's anti-degradation laws and water quality laws.

96.    According to publicly available manufacturer safety data sheets, Defendants' use of tear gas and other chemical munitions has subjected the Portland environment, including the Willamette River, wildlife, and aquatic life to chemicals rated as toxic for aquatic organisms. Defendants' use of tear gas and other chemical munitions can cause at least the following effects to aquatic life and the environment:

    a.  Harmful to aquatic life with long lasting (chronic) effects

    b.  Bioaccumulative potential

    c.  Harmful to fish and aquatic organisms

    d.  Harmful to the environment

    e.  Acute aquatic toxicity

97.    Aquatic toxicity for organisms can cause substantial damage through aquatic exposure to a chemical.  This damage can include, for example, death, life stage development, physiology, reproductive harm, growth, survival, bioaccumulation, behaviors such as feeding, predator avoidance, swimming performance, respiratory behavior, and social interaction.  In turn, these effects can impact aquatic life population, size, age, structure, resiliency, and ecological consequences.

98.    Silicon is sometimes added to tear gas and other chemical munitions to make it last longer in the air and on surfaces.

99.     Chemical hazard information for the chemical agents in CS gas warns of acute toxicity to aquatic life and advises that they should not enter sewers, surface waters, groundwater, or drinking water even in small quantities.

100.    Downtown Portland did not see meaningful rainfall in the month of July while these chemicals were sprayed and deployed repeatedly on demonstrators, and beginning on July 28, 2020, personnel on federal courthouse grounds were seen hosing off the street, which is directly sending this surface gas accumulation into the storm drains.

101.    After these reported and documented incidents of federal officers washing chemical residues into storm drains, on or about July 31, 2020, the Portland Bureau of Environmental Services ("BES") used vacuums to clean some sediment from some storm drains in downtown Portland in an effort to prevent additional pollutants from reaching the Willamette River.

102.    On August 6, 2020, prior to the first rain stormwater flush to the Willamette River, BES conducted stormwater sampling for some chemicals it hypothesized may be in the stormwater system from tear gas and other chemical munitions.

103.    An additional storm drain is located on federal property near the Justice Center. BES sought permission to access it for cleaning in early August 2020, but to date, has been unable to access it.

104.    Additional storm drains are located near the ICE Detention Center.  On or about September 17, 2020, BES cleaned "some" of the storm drains near the ICE Detention Center but did not test the sediment and residue.  Since September 17, 2020, the public has identified chemical munitions in the outfall leading to the Willamette River.  See, e.g., Decl. Simonis.

105.    Since August 6, 2020, the City has received rainfall.

106.    BES has stated that illegal discharges into the Willamette River of the chemical agents used on demonstrators had likely already occurred.

107.    Members of Plaintiff organizations have observed stormwater discharges from the Justice Center and ICE Detention Center storm drains before, during, and after rain events.  See, e.g., Decl. Simonis.

**Page 20 - COMPLAINT**

108.    Chemical agents and munitions from Operation Diligent Valor have likely reached the Willamette River.

**Efforts to Ascertain the Impacts of Operation Diligent Valor**

109.    State and city agencies have received reports of quantities of tear gas and other chemical munitions infiltrating Portland's air, settling onto Portland's vegetation and soil, and likely being deposited by air over the Willamette River.  See Decl. Williams; Decl. Simonis.

110.    On at least one occasion, Defendants' agents have been documented power washing the tear gas and other chemical munitions residue down the City's storm drains.  See, e.g., Decl. Simonis.

111.    City officials, including officials from BES, acknowledge that residue and sediment from tear gas and other chemical munitions being used by Defendants has entered the City's storm drains downtown.  At least two stormwater system outfalls in the vicinity of the 2020 protests discharge directly to the Willamette River.

112.    The City conducted one stormwater sampling event on August 6, 2020 and one sediment sampling event of sediment in the City's stormwater system on July 31, 2020.  The City conducted this sampling without information from DHS regarding the tear gas and chemical munitions DHS has used.  DHS did not provide location information to the City on where it used its weapons; the City conducted this sampling based on information reported to it from members of the public identifying where DHS was using weapons against them.

113.    To date, DHS has not provided a list of tear gas and chemical munitions used against protesters to BES.  Even if DHS provides such a list, BES acknowledges that the list will not include all riot control agents used by DHS.[5]  Nor has DHS provided information on the quantity of tear gas and other chemical munitions deployed, where these weapons were deployed, or the quantities of chemicals in the weaponry used.

---

[5] https://www.portland.gov/sites/default/files/2020-09/rca_samplingreport_sep2020.pdf. See BES Report at 2 (September 2020).

114.    The City's sampling was limited in at least the following ways:

a.  The City only tested for two tear gas related munitions and did not sample for chemicals in other munitions deployed by DHS during Operation Diligent Valor.

b.  The City conducted its sampling without access to a stormwater catch basin behind federal agents' barriers.  To date, the federal government has denied the City access to the catch basin.  In September 2020, the City levied a $20,000 penalty against the federal government to access the storm drain.  The City is still awaiting access.

c.  The City did not conduct this sampling in other areas of the City where the public are finding munitions and which have stormwater systems connecting to the Willamette River, including near the ICE Detention Center.

d.  The City visited the Hawthorne Bridge outfall at a high tide time and was unable to obtain a stormwater sample.

e.  The City sampled only for the presence of chemical analytes and did not analyze the impacts or effects of the chemicals identified in the samples.

115.    Oregon Senators Ron Wyden and Jeff Merkley have requested that U.S. Department of Justice ("DOJ") and DHS open investigations into the unrequested presence and violent actions of Defendants' deployment in Portland, including in part an investigation into the environmental implications and effects of the nightly use of tear gas and munitions against peaceful protesters.

116.    On July 30, 2020, Oregon Congressman Earl Blumenauer and Representative Karin Power formally requested that the U.S. Environmental Protection Agency ("EPA") and the Oregon Department of Environmental Quality ("DEQ") disclose what chemicals have been deployed to date against protesters in Portland, and identify potential impacts on human health, wildlife, aquatic life, and local air and water quality.  Specifically, their request seeks information relating to: (1) what chemicals and/or gases have been deployed and in what amounts; (2) material data sheets and applicable usage guidelines; (3) the implications of using

expired gases; (4) the plans for environmental review; (5) what monitoring has and will be conducted; and (6) plans for mitigation and clean-up.[6]

117.    The issues raised in Congressman Blumenauer's and Representative Power's July 30, 2020 request, and information requested by Willamette Riverkeeper, would have been available and addressed through an appropriate analysis by Defendants as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*

118.    On July 31, 2020, Willamette Riverkeeper communicated with BES, the DEQ, the Oregon Department of Agriculture, and Multnomah County, requesting information on the chemicals being used by federal agents in Portland, including testing.  The state agencies have not yet formally responded to Willamette Riverkeeper.  See Decl. Williams.

119.    On August 18, 2020, Willamette Riverkeeper submitted a Freedom of Information Act ("FOIA") request under 5 U.S.C. § 552, to the DHS for records relating to chemical munitions used, removed, cleaned, or flushed within the City of Portland since May 24, 2020. On September 21, 2020, DHS provided 13 pages of redacted records that were unresponsive to Willamette Riverkeeper's request.  See Decl. Williams.  Willamette Riverkeeper also submitted public records requests to DEQ, BES, and Multnomah County.  See Decl. Williams.

120.    In an August 5, 2020 letter,[7] Oregon Senator Ron Wyden expressed concern about the human health impacts of Defendants' sustained use of tear gas in Portland.  Senator Wyden's letter requested that DOJ and DHS disclose the chemical agents used against protestors in Portland by August 31, 2020.

121.    The issues raised in the BES study, Senator Ron Wyden's, Congressman Blumenauer's, and Representative Power's requests, and information requested by Plaintiff Willamette Riverkeeper, would have been available and addressed through an appropriate analysis by Defendants as required by NEPA, 42 U.S.C. §§ 4321 *et seq.*

---

[6] https://blumenauer.house.gov/sites/blumenauer.house.gov/files/2020-07-30%20Joint%20Letter%20to%20EPA%20and%20DEQ%20-%20FINAL.pdf
[7]
https://www.wyden.senate.gov/imo/media/doc/080620%20Wyden%20tear%20gas%20letter%20to%20Barr%20and%20Wolf.pdf

**Page 23 - COMPLAINT**

## FIRST CLAIM FOR RELIEF

**Defendants violated the Administrative Procedure Act because Defendants failed to comply with NEPA for their Operation Diligent Valor**

122.    Plaintiffs reallege and incorporate by reference all preceding paragraphs and declarations referenced therein and filed herewith.

123.    Operation Diligent Valor is a "major federal action" that triggers NEPA's requirements.

124.    NEPA requires Defendants to publish documents analyzing and documenting the environmental impacts, including direct, indirect, and cumulative impacts, of Operation Diligent Valor.

125.    The NEPA process is intended to help DHS decision-makers systematically identify and evaluate the potential environmental effects of proposed actions and make informed decisions.  Therefore, the NEPA process should have been completed before DHS made any final decision on Operation Diligent Valor.

126.    Defendants were required to produce an EIS for Operation Diligent Valor, but did not do so.

127.    For unknown or potentially significant impacts to the human environment, Defendants were obligated to prepare at least an EA for Operation Diligent Valor, but did not do so.

128.    Examples of situations in which NEPA is not triggered are very few.  NEPA applies to the majority of DHS actions, but if it not clear to Defendants whether NEPA was applicable to Operation Diligent Valor, Defendants were still obligated to consult with the Sustainability and Environmental Program and the Office of General Counsel to determine whether NEPA applies to a proposed action.  Defendants did not do so.

129.    Pursuant to DHS's NEPA regulations, Defendants were required to notify the Sustainability and Environmental Program in writing that they were undertaking an action that was "likely to receive high-level executive branch and/or national attention, including those that are likely to require the attention of either the Deputy Secretary or the Secretary," or involves a

"potential for significant environmental effects or where the effects are unknown."  The SEP coordinates with CEQ on compliance with the requirements of NEPA, including in the case of emergencies, where compliance must occur "as soon as possible."  Defendants did not do so.

130.    Even if Operation Diligent Valor was an emergency action, Defendants are still obligated to comply with NEPA as soon as possible.  Defendants have have had ample time, but still have not done so.

131.    Without observance of mandatory NEPA procedures, Defendants' Operation Diligent Valor, including its deployment of tear gas and other munitions, is arbitrary, capricious, not in accordance with law, and without observance of procedures required by law.  *See* 5 U.S.C. § 706.

132.    Plaintiffs are entitled to their reasonable attorney fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## PLAINTIFFS' PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment:

1.    Declaring that Defendants violated the National Environmental Policy Act, the Administrative Procedure Act, and their implementing regulations by failing to prepare an environmental analysis for their actions;

2.    Enjoining Defendants and their agents from deploying tear gas and other munitions, unless and until the violations of federal law set forth herein have been corrected;

3.    Awarding Plaintiffs their reasonable attorney fees, costs and expenses associated with this litigation pursuant the Equal Access to Justice Act, 28 U.S.C. § 2412, or other authority; and

///

///

///

///

///

4.      Granting Plaintiffs such other and further relief as the Court deems just and equitable.

DATED this 20th day of October, 2020.

MARKOWITZ HERBOLD PC

By:    *s/ Jeffrey M. Edelson*

Jeffrey M. Edelson, OSB # 880407
JeffEdelson@MarkowitzHerbold.com
Nathan D. Burcham, OSB #182509
NathanBurcham@MarkowitzHerbold.com
Telephone:  (503) 295-3085

Kelly K. Simon, OSB # 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OREGON
Telephone:  (503) 227-6928

Nicholas S. Cady, OSB # 113463
nick@cascwild.org
CASCADIA WILDLANDS
Eugene, OR  97440
Telephone:  (541) 434-1463

Elisabeth Holmes, OSB # 120254
eli@willametteriverkeeper.org
WILLAMETTE RIVERKEEPER
Telephone:  (541) 870-7722

Of Attorneys for Plaintiffs