**Jeffrey M. Edelson, OSB # 880407**
JeffEdelson@MarkowitzHerbold.com
Nathan D. Burcham, OSB #182509
NathanBurcham@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Tel:  (503) 295-3085
Fax:  (503) 323-9105

**Kelly K. Simon, OSB # 154213**
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OREGON
PO Box 40585
Portland, OR  97240
Tel:  (503) 227-6928

**Nicholas S. Cady, OSB # 113463**
nick@cascwild.org
CASCADIA WILDLANDS
PO Box 10455
Eugene, OR  97440
Tel:  (541) 434-1463
Fax:  (541) 434-6494

**Elisabeth Holmes, OSB # 120254**
eli@willametteriverkeeper.org
WILLAMETTE RIVERKEEPER
PO Box 293
Eugene, OR  97440
Tel:  (541) 870-7722

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES, WILLAMETTE RIVERKEEPER, CASCADIA WILDLANDS, NEIGHBORS FOR CLEAN AIR, AND 350PDX,<br><br>                                     Plaintiffs,<br>     vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his capacity | No.  3:20-cv-01816<br><br>**STANDING DECLARATION OF ASHLEY CHESSER, EXECUTIVE DIRECTOR OF NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES** |

**Page 1 - STANDING DECLARATION OF ASHLEY CHESSER, EXECUTIVE DIRECTOR OF NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES**

| | |
|---|---|
| as Acting Secretary, U.S. Department of Homeland Security, | |
| | Defendants. |

I, ASHLEY CHESSER, declare as follows:

1. My name is Ashley Chesser. I am over 18 years of age and reside in Eugene, Oregon. I make this declaration based on my own personal knowledge, and if called as a witness, I could and would competently testify to the facts herein under oath. As to matters which may reflect a matter of opinion, they reflect my personal opinion and judgment based on my personal experience.

2. My principal place of business is Northwest Center for Alternatives to Pesticides, 448 Charnelton Street, Eugene, OR 97401.

3. I am the Executive Director and a member of the 501(c)(3) and Northwest non-profit organization Northwest Center for Alternatives to Pesticides (NCAP). I have been involved with NCAP as an employee since 2014. I oversee and am intimately familiar with the organization's membership, activities, and operations.

4. I make this declaration in support of NCAP's participation in the NEPA lawsuit filed with this Court. The interests NCAP seeks to advance as a co-plaintiff fall squarely within the organization's mission.

5. NCAP's mission is to protect community and environmental health and inspire the use of ecologically sound solutions to reduce the use of pesticides. We do this through research, education, and advocacy about the harms of pesticides and similar chemicals to environmental health and the benefits of alternative solutions. Our organization believes that providing scientific information about the potential of chemicals to harm our soil, water and the air we breathe allows our supporters to make choices about how to protect their health and the health of their families.

6. Through my research at NCAP about tear gas, I have learned that tear gas and related fumigants have evolved hand-in-hand with the creation of pesticides since the early to mid 19th-century. Use of tear gas in warfare, as with all other chemical weapons, was

prohibited by the Geneva Protocol of 1925 and further defined in later treaties, such as the 1972 Biological Weapons Convention (BWC) and the 1993 Chemical Weapons Convention (CWC).

7. Despite outlawed use of riot control agents in warfare, NCAP's staff and members have seen these chemicals repeatedly used for domestic control in Portland in 2020 without clear identification of the chemicals deployed, and without examining the impacts to community and environmental health. This greatly concerns NCAP and directly relates to the organization's mission to provide scientific information to the public so that NCAP's supporters can be informed decision-makers.

8. NCAP has approximately 7,000 members and supporters who reside in Portland. We provide these supporters information about pesticides and related chemicals through a monthly newsletter, release of our resource materials, and through individual information requests.

9. Since 1977, NCAP has invested significant resources in educating members, the public, and local, state and federal governments about the negative impacts of pesticides and other chemicals on human, wildlife and overall ecosystem health. These activities include, for example, hosting educational workshops about pesticides and alternatives, disseminating scientific research about chemical impacts to endangered species, and assisting city and county governments in creating integrated pest management plans.

10. Since the protests began in Portland in mid-2020, NCAP has fielded questions from our members, supporters, staff, and the public regarding the potential human and environmental impacts due to the use of tear gas and other chemical munitions against protesters. My staff and I have been searching for as much information as we can gather, including collecting photographs of canisters from our supporters. However, very little is publicly available to us to be able to adequately identify and assess the potential environmental impacts. Even with NCAP's expertise and experience in working on chemicals, we have been at a disadvantage trying to discover what chemicals are being

used, in what quantities, and what human health and environmental exposure risks accompany these chemicals.

11.  NCAP members have expressed concern to us about the health impacts they have experienced after participation in Portland protests, but are afraid of coming forward as declarants in this matter due to fear of government retaliation and being targeted in their personal and professional lives. It is thus imperative that NCAP be able to act on behalf of its members and protect their interests.

12.  NCAP is very concerned about the potential negative impacts the chemicals released by federal agents in response to public protests have had and are having on the human health of Portland residents, including our supporters, and the larger Portland ecosystem. The organization has invested resources in trying to identify the chemicals at issue and their effects, and will continue to do so. This lawsuit is a further example of NCAP's efforts to obtain environmental and public health information and review of the chemicals used at protests. NCAP has had to engage counsel to bring this litigation to protect its rights and the rights of its members.

13.  I was a resident of Portland from 1999 to 2009 and regularly visit friends who live in the areas where the 2020 protests are occurring. I also spend time there in the course of my employment with NCAP to complete program activities and lead educational activities about alternatives to pesticides. I care about the health and well-being of the people who live in the protest areas, who attend protests, and who may be exposed to unknown chemicals.

14.  NCAP's organizational interests in educating our members about environmental issues in their communities has been harmed because the agency has not conducted an environmental analysis as NEPA requires. Protesters are not "pests" and the prolonged employment of chemicals similar to pesticides, without first conducting an environmental impact study, is unacceptable. Should NCAP be unable to bring suit to enforce the agency's compliance with NEPA, NCAP will be unable to effectively provide

Page 4 - STANDING DECLARATION OF ASHLEY CHESSER, EXECUTIVE
         DIRECTOR OF NORTHWEST CENTER FOR ALTERNATIVES TO
         PESTICIDES

information to our supporters about the potential impact to their health and we will be unable to address environmental pollution, harm to ecosystem health, and potential impacts to the residents who live in Portland.

15. If the agency had followed NEPA, my interests and those of NCAP, its members and supporters would be protected. If the agency were to conduct a NEPA analysis, it would identify information allowing me to educate myself, NCAP's members and supporters, and the public about the use of chemicals during the Portland protests and the impacts of these chemicals on human and environmental health. The agency's NEPA analysis would also result in a federal action that would not cause as much harm to environmental health because, as required by NEPA, harm identified through the NEPA process would have to be mitigated.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of October, 2020 in Eugene, Oregon.

*Ashley Chesser* (signature)

Ashley Chesser, Executive Director
Northwest Center for Alternatives to Pesticides