PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment & Natural Resources Division
PAUL G. FREEBORNE
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 532-5271
Fax: (202) 305-0506
paul.freeborne@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES, WILLAMETTE RIVERKEEPER, CASCADIA WILDLANDS, NIEGHBORS FOR CLEAN AIR, AND 350PDX<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; CHAD WOLF, in his capacity as Acting Secretary, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>    Defendants. | Case No. 3:20-cv-01816-IM<br><br>**FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT** |

## <u>FEDERAL DEFENDANTS' MOTION TO DISMISS</u>

Federal Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss this action.  In support of this Motion, Federal Defendants refer the Court to the attached Memorandum.  Pursuant to Local Rule 7-1, Federal Defendants conferred in good faith with counsel for Plaintiffs but were unable to resolve the issues raised by this Motion.

Dated:  January 8, 2021

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment & Natural Resources Division

PAUL G. FREEBORNE
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 532-5271
Fax: (202) 305-0506
paul.freeborne@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES, WILLAMETTE RIVERKEEPER, CASCADIA WILDLANDS, NIEGHBORS FOR CLEAN AIR, AND 350PDX | Case No. 3:20-cv-01816-IM |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; CHAD WOLF, in his capacity as Acting Secretary, U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    I.      Statutory and Regulatory Background ................................................... 3

          A.      Federal Authority to Protect Federal Property ........................... 3

          B.      The National Environmental Policy Act ..................................... 5

    II.     The Situation in Portland ...................................................................... 6

    III.    Plaintiffs' Complaint ............................................................................ 10

STANDARD ............................................................................................................... 11

ARGUMENT ............................................................................................................... 12

    I.      Plaintiffs Lack Article III Standing ...................................................... 12

          A.      Plaintiffs Lack Standing to Obtain Prospective, Injunctive Relief .......... 13

                1.      Plaintiffs fail to plead the real and immediate future harm necessary to have standing to obtain prospective equitable relief. ......................................................................... 14

                2.      Plaintiffs cannot proceed on procedural injury alone. .................. 16

                3.      Plaintiffs cannot proceed on harm that is not redressable ............. 17

          B.      Plaintiff Organizations Also Lack Direct Standing ................................. 17

    II.     Plaintiffs Also Fail to Plead Reviewable "Agency Action" or "Final Agency Action" ............................................................................................ 20

          A.      Plaintiffs Do Not Challenge "Agency Action" Under the APA .............. 20

          B.      Plaintiffs Also Do Not Challenge Reviewable "Final Agency Action." ............................................................................................ 21

    III.    Criminal Enforcement Actions Are Not "Major Federal Action" Requiring Preparation of an EIS ............................................................................ 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. NSA*,
  493 F.3d 644 (6th Cir. 2007) ................................................... 22

*Afifi v. Lynch*,
  101 F. Supp. 3d 90 ................................................................. 22

*Am. Fed'n of Gov't Emps. Local 1 v. Stone*,
  502 F.3d 1027 (9th Cir. 2007) ............................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................... 12

*Associated Gen. Contractors of Am.,  San Diego Chapter, Inc. v. Cal. Dep't of Transp.*,
  713 F.3d 1187 (9th Cir. 2013) ............................................... 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................... 12

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................ 5, 21

*Blue Ribbon Coal v. Mont. Wildernness Ass'n*,
  542 U.S. 917 (2004) ............................................................... 21

*Calipatria Land Co. v. Lujan*,
  793 F. Supp. 241 (S.D. Cal. 1990) ........................................ 24

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................. 14

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................... 14

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) .............................................. 6, 7, 8, 9, 10, 11

*E. Bay Sanctuary Covenant v. Trump*,
  950 F.3d 1242 (9th Cir. 2020) ................................... 13, 17, 18

*Found. on Econ. Trends v. Lyng*,
  943 F.2d 79 (D.C. Cir. 1991) ...................................... 16, 19

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
  887 F.3d 906 (9th Cir. 2018) ....................................... 12, 13

*Graham v. Connor*,
  490 U.S. 386 (1989) ................................................................. 4

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .................................................... 13, 17, 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)................................................................................................ 12

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994).................................................................................................. 11

*Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ................................................................................ 19

*Lujan v. Defs. of Wildlife*,
504 U.S 555 (1992).......................................................................................... 13, 14

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983)................................................................................................ 17

*Nelsen v. King County*,
895 F.2d 1248 (9th Cir. 1990) ................................................................................ 14

*Norton v. S. Utah Wilderness All.* ("*SUWA*"),
542 U.S. 55, 62 (2004)...................................................................................... 20, 21

*O'Shea v. Littleton*,
414 U.S. 488 (1974)................................................................................................ 14

*Pac. Nw. Generating Coop. v. Brown*,
38 F.3d 1058 (9th Cir. 1994) .................................................................................. 19

*Parsons v. U.S. Dep't of Justice*,
878 F.3d 162 (6th Cir. 2017) .................................................................................. 22

*Rattlesnake Coal. v. EPA*,
509 F.3d 1095 (9th Cir. 2007) ................................................................................ 11

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
324 F.3d 726 (D.C. Cir. 2003) ................................................................................ 22

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).................................................................................................. 5

*Rodriguez v. City of San Jose*,
930 F.3d 1123 (9th Cir. 2019) ................................................................................ 18

*Rosales v. United States*,
824 F.2d 799 (9th Cir. 1987) .................................................................................. 11

*Rosenblum v. Does 1-10*,
2020 WL 4253209 (D. Or. July 24, 2020).............................................................. 14

*Sackett v. EPA*,
566 U.S. 120 (2012)................................................................................................ 22

*Sierra Club v. Morton*,
405 U.S. 727 (1972)................................................................................................ 17

*Sierra Club v. Penfold*,
  857 F.2d 1307 (1988) ................................................................... 24

*Smith v. Pac. Properties & Dev. Corp.*,
  358 F.3d 1097 (9th Cir. 2004) .................................................... 12

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................... 11, 14

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................. 12, 16

*United States v. Glen-Colusa Irr. Dist.*,
  788 F. Supp. 1126 (E.D. Cal. 1992) .......................................... 24

*United States v. Rainbow Family*,
  695 F. Supp. 314 (E.D. Tex. 1988) ........................................... 24

*Village of Bald Head Island v. U.S. Corp of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) ..................................................... 20

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
  435 U.S. 519 (1978) ................................................................... 5

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) .................................................... 20

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) .................................................... 11

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ................................................................... 14

*Wild Fish Conservancy v. Jewell*,
  730 F.3d 791 (9th Cir. 2013) ................................................ 11, 21

*WildEarth Guardians v. USDA*,
  795 F.3d 1148 (9th Cir. 2015) .................................................... 12

*Wilderness Ass'n v. United States Forest Serv.*,
  314 F.3d 1146 (9th Cir. 2003) .................................................... 21

*Wilderness Soc'y v. Rey*,
  622 F.3d 1251 (9th Cir. 2010) .................................................... 16

**Statutes**

5 U.S.C. § 551(13) ...................................................................... 5, 20

5 U.S.C. § 702 .................................................................................. 5

5 U.S.C. § 704 ................................................................................ 21

40 U.S.C. § 1315 ....................................................................... 7, 20

40 U.S.C. § 1315(a) ................................................................................................................. 3

40 U.S.C. § 1315(b)(1) .......................................................................................................... 3

42 U.S.C. § 4321 ..................................................................................................................... 5

42 U.S.C. § 4332(2)(B) ......................................................................................................... 6

42 U.S.C. § 4332(2)(C) ..................................................................................................... 5, 23

**Rules**

FED. R. CIV. P. 12(B)(1) .................................................................................................. 1, 11

**Regulations**

40 C.F.R. § 1502.1 .................................................................................................................. 5

40 C.F.R. 1508.18(a) .............................................................................................................. 6

41 C.F.R. § 102-74 .................................................................................................................. 4

41 C.F.R. § 102-74.385 .......................................................................................................... 4

41 C.F.R. § 102-74.390 .......................................................................................................... 4

85 Fed. Reg. 43,304-43,305 (July 16, 2020) ...................................................................... 23

## INTRODUCTION

This past summer there were daily demonstrations in downtown Portland in support of racial justice and criminal justice reform.  The majority of protest activity was lawful and peaceful.  Certain individuals, however, chose to use peaceful demonstrations as cover to commit criminal acts, engaging in a wave of violence and looting.  To safely disperse crowds that posed a threat and to repel violent attacks, Federal law enforcement officers from the Department of Homeland Security (DHS) used various Riot Control Agents (RCAs), including pepper spray.

Plaintiffs, a collection of non-profit advocacy organizations, seek to enjoin DHS from deploying RCAs as part of any future law enforcement response.  Plaintiffs contend that DHS must prepare an Environmental Impact Statement (EIS) under the National Environmental Policy Act (NEPA) before deploying RCAs.  This action should be dismissed for lack of subject-matter jurisdiction and, in the alternative, for failure to state a claim.

*First,* to have the necessary Article III standing for prospective declaratory or injunctive relief—which is the only relief Plaintiffs seek—Plaintiffs must allege facts that show that they or their members face a real and immediate threat of future harm from DHS law enforcement personnel's deployment of RCAs.  Plaintiffs have not and cannot plead such facts.  The federal law enforcement presence in Portland has waned significantly since the end of July.  And DHS has been required to use RCAs on only three occasions since the end of July, when faced with sporadic yet extreme violence to federal personnel and property, or when necessary to provide emergency life safety mutual aid to the Portland Police Bureau.  Given the current situation in Portland, Plaintiffs do not allege and cannot allege a real and immediate threat of future harm from the RCAs they seek to enjoin.

Plaintiff organizations also assert direct standing based on allegations of harm to their organizational missions stemming from the lack of an EIS.  But they fail to allege facts that would demonstrate that the deployment of RCAs without an EIS prevents them from functioning.  Instead Plaintiffs proffer only allegations of procedural injury that both the Supreme Court and the Ninth Circuit have made clear are insufficient to confer standing.

*Second*, NEPA challenges proceed under the Administrative Procedure Act (APA), and are subject to the APA's limitations on review.  The routine, day-to-day law enforcement activity undertaken by DHS law enforcement personnel in Portland is not "agency action," as that term is defined in the APA.  Nor is it reviewable "final agency action" under the APA:  The deployment of RCAs by individual law enforcement officers does not consummate the agency's decision-making process, or determine rights and obligations, as is necessary to trigger APA jurisdiction.

*Finally*, even if Plaintiffs had standing, and even if this action were reviewable under the APA, the Council on Environment Quality (CEQ) regulations that implement NEPA specifically exclude from review agency activity and decision-making undertaken in criminal enforcement actions such as those taken in response to violence in Portland.  Therefore, DHS was not required to prepare an EIS for the deployment of law enforcement officers to Portland or to use RCAs to ensure public safety.  If federal law enforcement agencies such as DHS were required to undertake the time-consuming EIS process every time they needed to respond to immediate violent threats, they would be unable to undertake the prompt action necessary to protect public safety and carry-out their statutory law enforcement responsibilities.

## BACKGROUND

I.   **Statutory and Regulatory Background**

A.   **Federal Authority to Protect Federal Property**

The Federal Protective Service (FPS), a component of the Department of Homeland Security, is the federal agency charged with protecting federal facilities across the country. *See* Federal Protective Service Operation, at https://www.dhs.gov/fps-operations.  Congress authorized the Secretary of DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government."  40 U.S.C. § 1315(a).

The Secretary of Homeland Security may also designate DHS employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property."  40 U.S.C. § 1315(b)(1). While engaged in their duties, officers or agents designated under 40 U.S.C. § 1315(b)(1) are authorized to conduct a wide range of law enforcement functions:

> (A) enforce Federal laws and regulations for the protection of persons and property;
> (B) carry firearms;
> (C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;
> (D) serve warrants and subpoenas issued under the authority of the United States;
> (E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and
> (F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

*Id*. § 1315(b)(2).

Congress also authorized DHS, in consultation with the Administrator of General Services, to prescribe regulations "necessary for the protection and administration of property

owned or occupied by the Federal Government and persons on the property," and to impose

"reasonable penalties," including fines and imprisonment for not more than 30 days.

*Id.* §§ 1315(c)(1) and (2).  DHS's regulations regarding the protection and administration of

federal property are found at 41 C.F.R. Part 102-74, and cover many activities, including

prohibiting disorderly conduct on federal property (41 C.F.R. § 102-74.390); failing to obey a

lawful order (41 C.F.R. § 102-74.385); and creating a hazard on federal property (41 C.F.R. §

102-74.380(d)).

      In exercising its authority to protect federal property, FPS follows DHS policy on the use

of force.  *See* DHS Policy on the Use of Force (Sept. 7, 2018) (Ex. 1).  Consistent with guidance

from the Supreme Court, *see Graham v. Connor*, 490 U.S. 386 (1989), DHS policy authorizes

officers to "use only the force that is objectively reasonable in light of the facts and

circumstances confronting him or her at the time force is applied," recognizing that officers are

"often forced to make split-second judgments, in circumstances that are tense, uncertain, and

rapidly evolving."  Ex. 1 at 1.  The policy states that officers "should seek to employ tactics and

techniques that effectively bring an incident under control while promoting the safety of [the

officer] and the public, and that minimize the risk of unintended injury or serious property

damage."  *Id.* at 3.

      DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe

tactics."  *Id.* at 2-3.  DHS also emphasizes to its employees the importance of respecting

activities protected by the First Amendment.  *See* DHS Memo re: Information Regarding First

Amendment Protected Activities (May 17, 2019) (Ex. 2).  "DHS does not profile, target, or

discriminate against any individual for exercising his or her First Amendment rights."  *Id.* at 1.

**B.    The National Environmental Policy Act**

Congress enacted NEPA, 42 U.S.C. §§ 4321 *et seq.*, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). Under NEPA, a federal agency must prepare an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS is a "detailed statement" concerning "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided." *Id.; see also* 40 C.F.R. § 1502.1. Preparation of an EIS is a lengthy undertaking, requiring an agency to, among other things, publish notice of its intent to prepare an EIS, and circulate a draft of the EIS for public comment. *Id.* §§ 1502.9; 1502.20.

NEPA imposes procedural, not substantive, requirements. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). And because NEPA does not contain an internal standard of review, judicial review of an alleged NEPA violation is governed by the APA, and subject to the APA's limitations on review.

To obtain review under the APA, Plaintiffs must show that they have been affected by some "agency action" covered by the Act. 5 U.S.C. § 702. "Agency action" is defined to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent thereof, or failure to act." *Id.* § 551(13). Plaintiffs must also demonstrate that the challenged action is reviewable "final agency action" under Section 704 of the APA. *Id.* § 704. Only agency action that both "mark[s] [the] consummation of agency's [decision-making] process" and determines "rights or obligations . . . from which legal consequences will flow" is

reviewable under the APA.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citation and quotation omitted).

When it passed NEPA, Congress established the Council on Environmental Quality (CEQ) as the agency within the Executive Office of the President to administer Federal agency implementation of the Act.  42 U.S.C. §§ 4332(2)(B), (C), (I); 4342; 4344; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (recognizing CEQ's authority to promulgate regulations implementing NEPA's statutory requirements).  Acting pursuant to the President's Executive authority and this statutory authority, CEQ promulgates regulations guiding agency implementation of the statute.  40 C.F.R. parts 1500–1508 ("CEQ regulations").  CEQ's NEPA regulations exclude agency activity and decision-making undertaken in "criminal enforcement actions" from the definition of "major Federal action" that triggers NEPA review, including the requirement to prepare an EIS.  40 C.F.R. § 1508.1(q)(1)(iv) (formerly found at 40 C.F.R. 1508.18(a)).

## II.     The Situation in Portland

Since May, Portland has witnessed near daily protests in its downtown area.  *See* Declaration of Gabriel Russell ("Russell Decl."), FPS Regional Director, Ex. 3), ¶¶ 4-6.  While the daily daytime protests have been largely peaceful, from May through the end of July 2020, the nighttime protests often devolved into criminal activity, including vandalism, destruction of property, looting, arson, and assault.  *Id.*

Federal buildings and property were the targets of many of these violent attacks, including the Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the U.S. Immigration and Customs Enforcement Building, and the Edith Green Wendall Wyatt Federal Office Building.  *Id.* ¶ 4.  The damage caused to federal

property this summer resulted from a variety of unlawful acts, including violent opportunists using a propane powered launcher to fire a one-pound lead ball that left a divot in the exterior wall of the Hatfield Courthouse.  *Id.* ¶ 6.  Violent opportunists also caused significant damage by using large, crew-operated catapults to launch marbles, rocks, ball bearings, and heavy cans at officers and federal property.  *Id.*  The Hatfield Courthouse, alone, sustained more than $1,244,000 of damage.  *Id.* ¶ 6.

Federal law enforcement personnel charged with protecting federal property were not only targeted, many were actually injured while carrying out their responsibilities.  There were over 400 injuries to federal law enforcement officers during the rioting, including broken bones, hearing damage, eye damage, puncture wounds, lacerations, a dislocated shoulder, sprains, strains, and contusions.  *Id.*  ¶ 5.  Officers were subjected to threats, thrown rocks, ball bearings fired by wrist rockets, improvised explosives, aerial fireworks, commercial grade mortars, high intensity lasers targeting officers' eyes, thrown full and empty glass bottles, and balloons filled with paint and other substances such as feces.  *Id.* ¶ 5.  Some of these officers were unfortunately seriously injured.  One officer was struck in the head and shoulder by a protester wielding a two-pound sledgehammer when the officer tried to prevent the protester from breaking down a door to the Hatfield Courthouse.  *Id.*  Another officer was hit in the leg with a marble or ball bearing shot from a high-powered wrist rocket or air gun, resulting in a wound down to the bone.  *Id.*

Faced with this violence, DHS deployed additional law enforcement personnel to Portland pursuant to the agency's general law enforcement authority in 40 U.S.C. § 1315. *Id.* ¶ 8.  The law enforcement operation was named "Operation Diligent Valor."  *Id.*

DHS law enforcement personnel did their best to deescalate the situation.  Officers stationed themselves in a defensive posture intended to deescalate tensions, remaining inside

federal buildings, responding only to breach attempts, putting out fires, or other serious crimes. *Id.* ¶ 9. DHS law enforcement officers also used various non-lethal Riot Control Agents (RCAs), such as pepper spray, in an attempt to safely disperse the crowds and to repel attacks. *Id.* ¶ 8.

DHS's attempts to deescalate the violence was met with an increasingly violent series of attacks against federal law enforcement officers and property, culminating in violent opportunists attempting to break in and set fire to the Hatfield Courthouse in the early morning hours of July 3, 2020. *Id.* Violent opportunists acting in what appeared to be a coordinated manner breached the Courthouse by smashing the glass entryway doors. *Id.* The attackers threw balloons containing an accelerant liquid into the lobby of the Courthouse and fired powerful commercial fireworks towards the accelerant in an apparent attempt to start a fire. *Id.*

After July 3, the violence in Portland only intensified. Crowds grew from hundreds to thousands, and on some nights there were hundreds of violent opportunists attempting to vandalize federal property and assault federal law enforcement officers. *Id.* ¶ 10. During most nights between July 4 and July 30, 2020, violent opportunists attempted to breach the Hatfield Courthouse or the perimeter fencing protecting it, vandalize the Courthouse, and/or endanger its occupants (including by setting fires). *Id.*

In response to this violence and destruction of federal property, DHS and Department of Justice officers issued warnings to disperse from the federal property extending onto the street, and then they pushed the crowds back several blocks, to create a buffer zone to allow repairs to exterior security fixtures and to put out fires started in the vicinity of the Courthouse. *Id.* Violent opportunists continued to resist and attempt to assault federal officers while officers pushed them back. *Id.* After moving the violent crowds back a few blocks to perform these functions, federal law enforcement officers retreated to the exterior of the Courthouse grounds

8

and into the Courthouse.  *Id.*  Fifty-seven arrests were made by DHS law enforcement personnel—for assault on federal officers, destruction of government property, and arson—in connection with this violence.  *Id.* ¶ 11.

Since the end of July 2020, the violence directed at federal facilities and federal law enforcement personnel has been sporadic.  *Id.* ¶ 12.  And, on July 29, 2020, senior DHS officials and the Governor of Oregon reached an agreement regarding the situation in Portland.  Oregon State Police agreed to responsible for crowd control and law enforcement in the area surrounding the Federal Courthouse—thus allowing federal law enforcement to limit their presence to the Courthouse grounds.  *Id.*  After the agreement took effect, violent protests moved away from the Hatfield Courthouse and other federal buildings to other parts of Portland.  *Id.*

While a significant threat to federal facilities and the law enforcement officers protecting those facilities still remains in Portland, the presence of federal law enforcement officers over and above those that are normally assigned to Hatfield Courthouse has decreased significantly since the end of July.  *Id.*  ¶ 13.  Since the end of July 2020, moreover DHS law enforcement personnel have been required to use RCAs on only three occasions—when faced with sporadic yet extreme violence and threats to federal personnel and property, or when necessary to provide emergency life safety mutual aid to the Portland Police Bureau:

- The first time RCAs were used since the end of July was on September 23, 2020, when approximately 400 protesters attacked Portland Police with rocks, large Molotov cocktails, and attempted to forcibly breach the Justice Center adjacent to the Hatfield Federal Courthouse.  Portland Police made an emergency request for mutual aid based on the life-threating nature of the situation.  When DHS law

9

enforcement officers responded to the Portland Police's request for mutual aid, they were attacked. *Id.*

- The second instance occurred on September 26, 2020, when Portland Police officers were attacked with thrown objects while attempting to arrest a fleeing suspect. *Id.*

- And the final instance occurred on December 31, 2020, when approximately 100 protesters attacked the Justice Center and adjacent Hatfield Federal Courthouse by throwing mortars, fireworks and Molotov cocktails in an attempt to breach the facilities. Portland Police declared a riot after multiple verbal warnings to disperse were ignored. When DHS law enforcement personnel intervened to repel the violent offenders and to protect the Courthouse and persons in that federal facility, they were attacked. Twenty-six officers suffered at least 76 injuries during this attack, including chemical burns and blunt object strikes. *Id.*

## III.    Plaintiffs' Complaint

Plaintiffs are five advocacy organizations: Northwest Center for Alternatives to Pesticides (NCAP), Willamette Riverkeeper, Cascadia Wildlands, Neighbors for Clean Air (NCA), and 350PDX. Plaintiffs seek to enjoin DHS from using RCAs until DHS prepares an EIS under NEPA to assess the environmental impact of the RCAs used in Portland. Compl. Prayer for Relief 25, ECF No. 1 ("Compl."). Plaintiffs contend that "Operation Diligent Valor," is a "final agency action" subject to judicial review under the APA. Compl. ¶ 131. Plaintiffs further contend that "Operation Diligent Valor is a 'major Federal action' that triggers NEPA's requirements," *id.* ¶ 123, and that DHS violated NEPA by not preparing a full EIS before

undertaking the law enforcement response in Portland and using RCAs in response to violence. *Id.* ¶ 131.

## STANDARD

Because Plaintiffs lack Article III standing, fail to allege a "final agency action" that is subject to review under the APA, or otherwise present a cognizable theory of liability under NEPA, Federal Defendants assert this action must be dismissed under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

Plaintiffs bear the burden of establishing that the court has the requisite subject-matter jurisdiction to grant the relief requested. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal courts are courts of limited jurisdiction; "[t]hey possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Id.* (internal citation omitted). Article III standing is thus a "threshold jurisdictional question" that must be decided before the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). And if review is not available under the APA, dismissal is also appropriate because the Court lacks subject-matter jurisdiction to hear a dispute outside of the waiver of sovereign immunity that Plaintiffs invoke in this action. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("Absent final agency action, there is no jurisdiction in the district to review a NEPA claim."); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 802 (9th Cir. 2013) (recognizing that court lacks jurisdiction to hear action that does not challenge "final agency action"). A Court may consider material outside of the pleadings related to such jurisdictional issues without converting the motion to dismiss to a motion for summary judgment. *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987).

11

"To survive a motion to dismiss, a complaint must [also] contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  If Plaintiffs fail to do so, dismissal of the action is appropriate on the merits under Rule 12(b)(6).

## ARGUMENT

### I.      Plaintiffs Lack Article III Standing

Plaintiff organizations allege that they have both associational standing and direct standing to proceed.  *See* Compl. ¶¶ 25-29.  Plaintiffs fail to allege facts that would permit them to proceed on behalf of their members or based upon their direct, actual harm under Article III.

To have Article III standing, Plaintiffs must allege facts demonstrating that: (1) the organization itself (or one of its members) has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action rather than the action of a third party; and (3) that it is likely, as opposed to merely speculative, that a favorable judicial decision will prevent or redress the injury.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *WildEarth Guardians v. USDA*, 795 F.3d 1148, 1154 (9th Cir. 2015).

An organizational plaintiff can assert associational standing based on the standing of its members.  *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004). Associational standing requires that Plaintiffs plead facts that demonstrate their members would have standing to sue in their own right.  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 917-18 (9th Cir. 2018); *Associated Gen. Contractors of Am.,  San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).  This showing requires that Plaintiffs

allege facts that would permit a member to satisfy the injury-in-fact, causation, and redressability elements that are the "irreducible constitutional minimum" under Article III. *Friends of Santa Clara River*, 887 F.3d at 908 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S 555, 560 (1992)).

An organization may also assert standing to proceed directly based on actual harm suffered. To do so, an organization must plead facts demonstrating that government conduct challenged [1] frustrated its mission and [2] caused it to divert resources in response to that frustration of purpose. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). In essence, this requires that Plaintiffs plead facts showing that the challenged government conduct impairs their ability to function as an organization or prevents the organization from engaging in an activity that is central to its purpose. In addition, Plaintiffs must plead facts showing that they actually diverted resources in response to a cognizable frustration of organizational purpose. The expenditure of resources, by itself, is insufficient to satisfy the second prong of the *Havens Realty Corp.* test.

### A.   Plaintiffs Lack Standing to Obtain Prospective, Injunctive Relief

Because Plaintiffs fail to plead facts showing real and immediate harm from the future use RCAs by DHS law enforcement personnel, they lack standing to obtain prospective equitable relief. And while Plaintiffs attempt to sidestep their burden of pleading concrete harm by alleging that their members suffer procedural (or informational) injury under NEPA, procedural harm, alone, is not injury-in-fact. Finally, the recreational and physical harm that Plaintiffs' members allege stems from the past use of RCAs is not harm that can be remedied under NEPA. NEPA's remedial scheme only addresses future harm—not harm from past acts. Plaintiffs, therefore, do not and cannot plead redressability, another of the Article III requirements.

**1.    Plaintiffs fail to plead the real and immediate future harm necessary to have standing to obtain prospective equitable relief.**

Where, as here, a party seeks prospective equitable relief, there must be "allegations of future injury [that are] particular and concrete." *Steel Co.,* 523 U.S. at 109.  And the required "threatened injury must be *certainly impending*"—not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  While allegations of past injury might support a remedy at law, a request for prospective equitable relief requires more—facts demonstrating real and immediate future harm.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (threatened injury must be "certainly impending").

"Standing is a remedy-specific injury," and a request for prospective, declaratory and injunctive relief requires more than an associational member who alleges harm in the past; it requires a "'real or immediate threat that [he] will be wronged again.'" *Rosenblum v. Does 1-10,* 2020 WL 4253209 at *6 (D. Or. July 24, 2020) (alteration in original) (quoting *Lyons*, 461 U.S. at 111).  The obligation to plead real and immediate future harm recognized in *Lyons* and *O'Shea* is well-established in the law enforcement context presented under the facts here.  *Lyons*, 461 U.S. at 101–02; *Nelsen v. King County*, 895 F.2d 1248, 1251 (9th Cir. 1990); *Rosenblum*, 2020 WL 4253209 at *6.  And it is equally well-rooted in actions involving environmental matters. *See e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (recognizing that *Lyons* requires an environmental plaintiff to allege more than past harm to obtain injunctive relief; an environmental plaintiff must plead facts of "imminent" future injury from the government conduct challenged).

Because Plaintiffs fail to plead facts showing real and immediate harm from the future use of RCAs, Plaintiffs lack standing to obtain the prospective equitable relief that they seek in this action. None of the Plaintiff organizations can allege any direct harm from the RCAs used in Portland at all. Plaintiffs are forced then to assert associational standing to proceed for that relief. But none of the associational members plead facts that would demonstrate that they face any real and immediate threat from the future use of RCAs deployed by DHS law enforcement personnel. *See* ECF Nos. 8-18 (standing declarations). The members instead claim to have been exposed to RCAs used by DHS law enforcement personnel in July of last year—not since. *See* Decl. of Brenna Bell, ECF No. 14 (alleging DHS law enforcement used of RCAs such as pepper balls on July 17 and 29, 2020); Decl. of Indigo Namkoong, ECF No. 18 (alleging that DHS law enforcement personnel used RCAs such as pepper spray on July 11, 22, 25, and 26, 2020); Decl. of Mary Peveto, ECF No. 15 (alleging that DHS law enforcement personnel used RCAs on July 29, 2020); Decl. of Lisa Leithauser, ECF No. 16 (alleging that DHS law enforcement personnel used RCAs on July 21 and 24, 2020).[1]

Even if the Court were to credit the associational members' allegations of *past* exposure to RCAs, past exposure does not establish a real and immediate threat of being exposed to such munitions in the future, as required to seek prospective equitable relief. And none of Plaintiffs' members could credibly allege such future real and immediate harm. The violence in Portland

---

[1] Two members claim that tear gas was used in Portland on August 2nd and 4th, and September 5th, 2020. But neither alleges that DHS law enforcement personnel used tear gas on any of those dates. *See* Decl. of Dominica Navarro, ECF No. 9 (alleging effects from tear gas on September 5, 2020, but not identifying DHS law enforcement personnel as the agency or entity employing that munition); Decl. of Kristin Teigen, ECF No. 17 (claiming to have attended protests on August 2nd and 4th, and having experienced the "residual effect" of "tear gas," but failing to identify DHS as the agency or entity employing that munition). Nor could they: DHS law enforcement personnel did not use RCAs on any of the referenced dates. *See* Russell Decl., Ex. 3, ¶ 14.

has waned since the end of July 2020.  As result, DHS law enforcement personnel have been forced to use RCAs on only three occasions since July, in response to extreme threats to federal personnel and property, or when necessary to provide critical mutual aid to the Portland Police Bureau.  Russell Decl., Ex. 3, ¶ 13.  Tellingly, none of Plaintiffs' members even allege they were exposed to the RCAs used in any of these post-July incidents.  Plaintiffs, accordingly, fail to satisfy their pleading burden to establish associational standing for the prospective equitable relief they seek.

### 2.    Plaintiffs cannot proceed on procedural injury alone.

Rather than meet the pleading burden required to obtain prospective relief, Plaintiffs attempt to circumvent it by alleging procedural injury (or informational injury) purportedly stemming from the lack of an EIS.  *See e.g.,* Compl. ¶ 25 (alleging procedural or informational harm from the absence of an EIS.  But an alleged "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *See Summers*, 555 U.S. at 496 (recognizing that a party who fails to plead likelihood of concrete future harm under *Lyons* cannot proceed upon alleged procedural injury alone); *Wilderness Soc'y v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010) (recognizing that "procedural injury, standing on its own, cannot serve as an injury-in-fact.").  Otherwise, every putative NEPA plaintiff would be able to circumvent the obligation to plead concrete harm by alleging a procedural (or informational) injury.  *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991) (explaining that allowing informational deprivation alone to satisfy the standing burden "would potentially eliminate any standing requirement in NEPA cases").

### 3. Plaintiffs cannot proceed on harm that is not redressable.

Plaintiffs also cannot sidestep their obligation to plead facts of real and immediate future harm by alleging that their members purportedly suffered recreational and physical harm from RCAs that were used in the *past* by DHS law enforcement personnel. *See* Decl. of Juniper Simonis, ECF No. 11 (alleging environmental harm to Willamette River from purported past use of RCAs); Decl. of Gordon Esses Noble, Jr., ECF No. 12 (same); Decl. of Brenna Bell, ECF No. 14 (alleging physical harm from purported past use of RCAs); Decl. of Kristin Teigen, ECF No. 17 (same); and Decl. of Indigo Namkoong, ECF No. 18 (same). Plaintiffs' alleged harm is not redressable under NEPA. Even if the agency were to prepare an EIS, that would not redress alleged past harm. NEPA is not the vehicle to redress past harm: NEPA was instead enacted to permit federal agencies "to assess the future effects" future major Federal action. *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 779 (1983). "NEPA is not directed at the effects of [the] past . . . and does not create a remedial scheme for past federal actions." *Id.*

### B. Plaintiff Organizations Also Lack Direct Standing

Lastly, Plaintiff organizations suggest that they can proceed directly based upon actual harm to the organizations themselves. *See* Compl. ¶¶ 25-29. To do so, Plaintiffs must plead facts showing that DHS law enforcement use of RCAs without an EIS has [1] frustrated their mission and [2] caused them to divert resources in response to that frustration of purpose. *E. Bay Sanctuary Covenant*, 950 F.3d at 1265; *Havens Realty Corp.,* 455 U.S. at 378–79.

Plaintiffs have not and cannot plead any facts that would satisfy either aspect of this two-part test. An organization cannot establish standing to sue based on "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Frustration of

17

mission, therefore, is only triggered where government conduct impairs the organization's ability to function or prevents it from engaging in an activity that is central to its purpose.  In *Havens Realty*, for example, the plaintiff organization was permitted to proceed on its own under Article III because it provided direct counseling and referral services to low-income home seekers that was impaired by the government conduct challenged.  455 U.S. at 378–79.  Other cases decided since *Havens Realty* have similarly permitted direct organizational standing only where the challenged conduct fundamentally frustrates an organization's mission.  *See, e.g.*, *E. Bay Sanctuary Covenant*, 950 F.3d at 1259, 1266 (ruling that organization with a "mission of assisting migrants seeking asylum" could sue to enjoin a rule "strip[ping] asylum eligibility from every migrant who crosses into the United States between designated ports of entry"); *Am. Fed'n of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1030–32 (9th Cir. 2007) (ruling that labor union could sue to enjoin a policy that "interfered with [its] ability to solicit membership and communicate its message").

Plaintiffs are advocacy organizations that cannot allege any interference with any "service," as in *Havens Realty*.  Nor do they allege facts that would demonstrate that the lack of an EIS frustrates their ability to operate.  *See* Compl. ¶¶ 25-29.  Even if the Court were to credit Plaintiffs' allegations that the use of RCAs without an EIS is contrary to their advocacy missions, the alleged frustration of an advocacy objective does not confer direct standing. *Havens Realty*, 455 U.S. at 379; *see also Rodriguez v. City of San Jose*, 930 F.3d 1123, 1127–28, 1134–36 (9th Cir. 2019) (gun-rights advocacy organization lacked standing to challenge California's confiscation of guns belonging to a person who had been involuntarily committed for a mental health evaluation and treatment).  Plaintiffs' attempt to secure direct standing based upon procedural (or informational) injury also fails.  Even if the Court were to credit Plaintiffs'

allegations of procedural injury, *see* Decl. of Ashley Chesser, Exec. Dir., NCAP, ECF No. 8, ¶ 15 (alleging procedural harm to NCAP's interests from lack of NEPA review of RCAs used in Portland); Decl. of Travis William, Exec. Dir. of Willamette Riverkeeper, ECF No. 10, ¶ 24 (alleging procedural harm to Willamette Riverkeeper's interests from lack of NEPA review of RCAs used in Portland); Decl. of Josh Laughlin, Exec. Dir. of Cascadia Wildlands, ¶ 11 (alleging procedural harm to Cascadia Wildlands's interests from lack of NEPA review of RCAs used in Portland), *Summers* and Ninth Circuit authority make clear that procedural injury, alone, is not injury-in-fact.  And that rule of law equally applies to organizations. *See e.g., Lyng*, 943 F.2d at 84 (rejecting that organizational standing cannot be based solely on the lack of NEPA review).

For similar reasons, Plaintiffs cannot plead a diversion of resources, the second of the elements required to secure direct organizational standing.  To plead injury from diversion of resources, a plaintiff organization must plead facts showing that it "would have suffered some *other* injury if it had not diverted resources."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)) (emphasis added).  Otherwise, an organization could simply manufacture its own Article III harm by expending resources in purported response to any action with which it disagreed.  *See Pac. Nw. Generating Coop. v. Brown*, 38 F.3d 1058, 1063 (9th Cir. 1994) (recognizing that standing cannot be manufactured by "subsidizing research in a topic at a university; otherwise it would be an easy matter for any corporation anywhere to create its own standing by an appropriate grant for academic research.").  Plaintiffs have not and cannot allege facts showing that a diversion of resources has been necessary to prevent some "other" harm.  Plaintiffs thus also lack direct standing to proceed.

This action should be dismissed under Rule 12(b)(1).  Standing is an indispensable part of Plaintiffs' case.  Without it, the Court lacks jurisdiction.  Rule 12(b)(1) dismissal is thus required.  *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1140 (9th Cir. 2003).

## II.     Plaintiffs Also Fail to Plead Reviewable "Agency Action" or "Final Agency Action"

Even if Plaintiffs had standing, however, Plaintiffs also fail to present a reviewable action under the APA.  As an initial matter, while Plaintiffs claim to challenge DHS's decision to deploy federal law enforcement personnel pursuant to 40 U.S.C. § 1315 (*see* Compl. ¶ 131), the "action" they really challenge is the use of RCAs by individual law enforcement personnel.  Indeed, Plaintiffs' requested remedy—an injunction against the deployment of RCAs, *see id.* Prayer for Relief—makes this clear.  But regardless of how Plaintiffs attempt to frame their challenge under the APA, neither the use of a particular tool by individual law enforcement officers, nor the deployment of additional law enforcement officers to protect federal personnel and property, is "agency action" under the APA or "final agency action" subject to judicial review.

### A.     Plaintiffs Do Not Challenge "Agency Action" Under the APA

The on-going law enforcement activities of DHS, carried out by individual law enforcement personnel, are not "agency action" under the APA.  The APA defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent thereof, or failure to act." 5 U.S.C. § 551(13) (definition of "Agency action").  "All of those categories involve circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004).  They do not include the law enforcement activity here.

"The term 'action' as used in the APA is a term of art that does not include all conduct." *Village of Bald Head Island v. U.S. Corp of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013)

(recognizing that performance under contract is not agency "action").  For that reason, an

agency's day-to-day functions undertaken by individual agency personnel are not "agency

actions" governed by the APA.  *See e.g.*, *Wild Fish Conservancy*, 730 F.3d at 801-02

(recognizing that ongoing operation of dams is not "agency action"); *Mont. Wilderness Ass'n v.*

*United States Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir. 2003), *vacated on other grounds*, *Blue*

*Ribbon Coal v. Mont. Wildernness Ass'n*, 542 U.S. 917 (2004) (recognizing that trail

maintenance is not "agency action" under the APA).[2]  Because Plaintiffs' challenge falls outside

of "agency action" governed by the APA, the Court can dismiss this action for this reason alone.

> **B.    Plaintiffs Also Do Not Challenge Reviewable "Final Agency Action**."

The conduct challenged here, however, are also not reviewable "final agency action."

5 U.S.C. § 704.  To be a "final agency action," the action must "mark consummation of agency's

[decision-making] process" or "be one by which rights or obligations have been determined or

from which legal consequences will flow." *Bennett,* 520 U.S. at 178 (internal citation and

quotation omitted).  The test thus examines the conduct challenged from both the agency's

perspective and that of the public.  The law enforcement response challenged here is not "final

agency action" under either perspective.

---

[2] As pled, moreover, Plaintiffs do not appear to challenge "discrete agency action," as is
additionally required under the APA. *SUWA,* 542 U.S. at 62-63.  Plaintiffs appear instead to
challenge DHS's use of RCAs, generally, not only in Portland.  *See* Compl. 25 (seeking order
enjoining Federal Defendants from deploying all RCAs until an EIS is prepared).  Given the
inability for a court to function in such a day-to-day managerial role over agency operations, the
APA limits judicial review to challenges of discrete agency action and prohibits the broad
programmatic challenge Plaintiffs appear to make in the Complaint.  *SUWA,* 542 U.S. at 62–64,
66–67; *see e.g.*, *Wild Fish Conservancy*, 730 F.3d at 801 (ruling that challenge to federal
defendants' general operation of dam fails to challenge discrete agency action reviewable under
the APA).  The action should be dismissed for this additional reason.

From the agencies' perspective, the deployment of law enforcement personnel to address violence in Portland does not consummate any decision-making process; daily deployments are incremental steps undertaken in addressing and managing an unfolding law-enforcement crisis. Agency actions are consummated when they are "not subject to further Agency review." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).  The ongoing deployment of law enforcement personnel does not reach that status; it necessarily can (and should) be augmented, curtailed, adjusted, or rescinded at any time within the discretion of the agency as circumstances on-the-ground dictate. And from the public's perspective, neither the deployment of law enforcement personnel to protect federal personnel and property, nor the decisions of individual law enforcement personnel to use RCAs, determine anyone's legal rights or carry any legal consequence.

Indeed, courts have repeatedly recognized that law enforcement investigations and operations do not constitute reviewable "final agency action." *See Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 n. 14 (D.D.C. 2015) (recognizing that law enforcement investigation is not final agency action); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (holding that an agency's investigation, prior to filing any administrative complaint, was not "final agency action" because the agency "ha[d] not yet made any determination or issued any order imposing any obligation on [Plaintiff], denying any right of [Plaintiff], or fixing any legal relationship."); *ACLU v. NSA*, 493 F.3d 644, 678 (6th Cir. 2007) (rejecting challenge to "NSA's warrantless interception of overseas communications, the NSA's failure to comply with FISA's warrant requirements, and the NSA's presumed failure to comply with FISA's minimization procedures," for failure to allege "final agency action")); *see also Parsons v. U.S. Dep't of Justice*, 878 F.3d 162, 169 (6th Cir. 2017) (finding that a gang designation was not "final agency action" because it "does not result in legal consequences

because it does not impose liability, determine legal rights or obligations, or mandate, bind, or limit other government actors").  Subjecting routine law enforcement responses to court supervision under the APA would not only ignore the limitations Congress imposed on judicial review, it would be highly disruptive of DHS's statutory responsibility to protect public safety and property.

## III.   Criminal Enforcement Actions Are Not "Major Federal Action" Requiring Preparation of an EIS

Finally, even if the Court had jurisdiction, DHS deployed law enforcement personnel to Portland to protect federal personnel and property.  And DHS used RCAs to address the violence and destruction of property that was occurring in Portland in violation of law.  Because agency activity and decision-making regarding "criminal enforcement actions" is exempt from NEPA review, including the obligation to prepare an EIS, Plaintiffs' theory of liability fails as a matter of law.

NEPA only mandates that federal agencies prepare an environmental analysis "on proposals for . . . major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  CEQ's regulations exclude from the definition of "major Federal action" agency "activity or decision[s]" regarding "judicial or administrative civil or criminal enforcement actions." 40 C.F.R. § 1508.1(q)(1)(iv).  It would be impractical for DHS, or any other federal law enforcement agency, to wait to prepare an EIS, subject the EIS to public comment, and then finalize the EIS, prior to undertaking law enforcement action to protect federal personnel and property.  In its most recent review, CEQ found that, across the Federal government, the average time for completion of an EIS (and the Record of Decision that follows) took, on average, 4.5 years.  *See* Update to the Regulations Implementing the Procedural Provisions of the Natural Environmental Policy Act (NEPA), 85 Fed. Reg. 43304,

43305 (July 16, 2020).  The violence in Portland highlights that law enforcement agencies must have the latitude to act promptly to ensure public safety; law enforcement agencies cannot be expected to spend nearly five years on a public environmental review *before* such action.

Even in the non-criminal context, such as where an agency seeks to obtain compliance with a law though a civil injunction, courts recognize that imposing NEPA obligations "would lead to a highly impractical result in which any decision of a law enforcement agency—whether to go forward with an action or forbear from action—would require a NEPA analysis." *See United States v. Glen-Colusa Irr. Dist*., 788 F. Supp. 1126, 1135 (E.D. Cal. 1992) (recognizing that National Marine Fisheries Service civil action to enforce compliance with the Endangered Species Act proscription on takings through injunction "is effort to enforce compliance and is not major federal action triggering NEPA"); *Calipatria Land Co. v. Lujan*, 793 F. Supp. 241, 245 (S.D. Cal. 1990) (recognizing that there "can be no question that the enforcement of" Fish and Wildlife Service anti-baiting regulations through injunction is exempt from NEPA review); *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (1988) (recognizing that Bureau of Land Management's enforcement authority is not "major Federal action" triggering NEPA review); *United States v. Rainbow Family*, 695 F. Supp. 314, 324 (E.D. Tex. 1988) (recognizing that NEPA exempts from review agency decisions regarding whether to "bring civil or criminal action to enforce Forest Service or other governmental regulations and statutes").

Plaintiffs fail to cite a single example in their Complaint where federal agencies were required to prepare an analysis under NEPA before undertaking criminal enforcement actions like DHS undertook in Portland.  That is because Plaintiffs' theory of NEPA liability is not only contrary to the specific direction provided by CEQ in NEPA implementing regulations, federal caselaw interpreting NEPA obligations, and the public interest—it defies common sense.

## <u>CONCLUSION</u>

This action should be dismissed, with prejudice, under Rules 12(b)(1) or, in the

alternative, 12(b)(6).

Dated:  January 8, 2021                    PAUL E. SALAMANCA
                                           Deputy Assistant Attorney General
                                           Environment & Natural Resources Division

                                            /s/ *Paul G. Freeborne*
                                           _____
                                           PAUL G. FREEBORNE
                                           Natural Resources Section
                                           Trial Attorney
                                           PO Box 7611
                                           Washington, DC 20044-7611
                                           Tel: (202) 532-5271
                                           Fax: (202) 305-0506
                                           paul.freeborne@usdoj.gov

                                           *Counsel for Federal Defendants*

25