**Jeffrey M. Edelson, OSB # 880407**
JeffEdelson@MarkowitzHerbold.com
**Nathan D. Burcham, OSB #182509**
NathanBurcham@markowitzherbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Tel:  (503) 295-3085
Fax:  (503) 323-9105

**Kelly K. Simon, OSB # 154213**
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OREGON
PO Box 40585
Portland, OR  97240
Tel:  (503) 227-6928

      Attorneys for Plaintiffs
      Additional Counsel of Record Listed on Signature Page

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES, WILLAMETTE RIVERKEEPER, CASCADIA WILDLANDS, NEIGHBORS FOR CLEAN AIR, AND 350PDX,<br><br>              Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, in his capacity as Secretary, U.S. Department of Homeland Security,<br><br>              Defendants. | No. 3:20-cv-01816-IM<br><br>**PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6) AND MEMORANDUM IN SUPPORT** |

# TABLE OF CONTENTS

Pages

INTRODUCTION AND BACKGROUND ................................................................ 2

LEGAL STANDARDS ........................................................................................... 2

POINTS AND AUTHORITIES ............................................................................... 3

I.     Plaintiffs have standing........................................................................................ 3

    A.     Defendants' harms to Plaintiffs' members are actual and imminent. ..................... 3

    B.     Defendants' procedural failures harm Plaintiffs' concrete interests. ...................... 6

    C.     Defendants harm Plaintiffs' concrete interests. ..................................................... 7

    D.     This Court can redress the injuries Defendants are inflicting on Plaintiffs. ........................................................................................................... 8

    E.     Defendants' failure to comply with NEPA frustrates Plaintiffs' missions and diverts Plaintiffs' resources. ............................................................ 10

        1.     Frustration of mission. .............................................................................. 11

        2.     Diversion of resources. ............................................................................. 13

II.    Plaintiffs have pleaded discrete and final agency action. .................................. 15

    A.     Agency action. .................................................................................................. 15

        1.     Implementation of Operation Diligent Valor as "failure to act." ............. 15

        2.     Implementation of Operation Diligent Valor as an "order." ..................... 16

        3.     Implementation of Operation Diligent Valor as a "rule." ......................... 17

        4.     Implementation of Operation Diligent Valor as "relief." ......................... 17

        5.     Basic fairness requires the Court's review. ............................................... 18

    B.     Final Agency Action. ........................................................................................ 18

        1.     Consummation of decisionmaking process. .............................................. 18

        2.     Rights, obligations, and legal consequences. ............................................ 20

        3.     Defendants' "law enforcement investigation" case citations do not establish a lack of final agency action. ............................................... 21

    C.     Discreet agency action. ..................................................................................... 22

    D.     Conclusion. ....................................................................................................... 24

III.   The implementation of Operation Diligent Valor is a major federal action. .................... 24

    A.     Operation Diligent Valor fits squarely within DHS' own definition of "major federal action." ..................................................................................... 25

B.    Operation Diligent Valor is not exempt from NEPA............................................. 27

C.    Neither impracticality nor purported emergencies obviate the need for a
        NEPA analysis. ......................................................................................... 28

Conclusion ......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACLU v. NSA*,
   493 F.3d 644 (6th Cir. 2007) ................................................. 22

*Afifi v. Lynch*,
   101 F. Supp. 3d 90 (D.D.C. 2015) ........................................ 22

*Alexander v. Riga*,
   208 F.3d 419 (3d Cir. 2000) ................................................. 14

*Am. Fed'n of Gov't Employees Local 1 v. Stone*,
   502 F.3d 1027 (9th Cir. 2007) .............................................. 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................ 2, 3

*Audubon Soc. of Portland v. Jewell*,
   104 F. Supp. 3d 1099 (D. Or. 2015) ..................................... 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................. 2

*Bennett v. Spear*,
   520 U.S. 154 (1970) ............................................... 18, 20, 21

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) .............................................. 25

*Calipatria Land Co. v. Lujan*,
   793 F. Supp. 241 (S.D. Cal. 1990) ....................................... 27

*Cantrell v. City of Long Beach*,
   241 F.3d 674 (9th Cir. 2001) ............................................... 7, 9

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ........................................................... 25

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   341 F.3d 961 (9th Cir. 2003) ................................................. 7

*City of Davis v. Coleman*,
   521 F.2d 661 (9th Cir. 1975) ................................................. 6

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ............................................................... 5

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................. 4

*Comm. For Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*,
   644 F. Supp. 2d 1177, 1195 (N.D. Cal. 2009) ...................... 14

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ................................................ 3

iii

*El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*,
    959 F.2d 742 (9th Cir. 1991) ...................................................................... 12, 14

*Fair Hous. Council of Or. v. Travelers Home and Marine Ins. Co.*,
    No. 3:15-CV-00925-SB, 2016 WL 7423414 (D. Or. Dec. 2, 2016)............................... 11

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012) ..................................................................... 14

*Fair Hous. of Marin v. Combs*,
    2000 WL 365029 (N.D. Cal. Mar. 29, 2000).......................................................... 10, 13

*Faith Int'l Adoptions v. Pompeo*,
    345 F. Supp. 3d 1314 (W.D. Wash. 2018)...................................................... 16

*Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*,
    397 F. Supp. 2d 1241 (D. Mont. 2005).......................................... 9, 16, 19, 20, 23, 29, 30

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).............................................................................. 8, 10

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
    887 F.3d 906 (9th Cir. 2018) ...................................................................... 6

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ...................................................................... 15

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
    860 F.3d 1244 (9th Cir. 2017) ..................................................................... 5

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ...................................................................... 16, 20

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................. 3, 11, 13

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)............................................................................. 10

*Idaho Sporting Congress v. Thomas*,
    137 F.3d 1146, 1149 (9th Cir.1998) ............................................................ 25

*Index Newspapers LLC v. United States Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) ...................................................................... 5

*La Asociacion de Trabajadores de Lake v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) .......................................................... 3, 9, 10, 14, 18

*Las Americas Immigrant Advocacy Ctr. v. Trump*,
    475 F. Supp. 3d 1194 (D. Or. 2020) ............................................................ 11

*Laub v. U.S. Dep't of Interior*,
    342 F.3d 1080 (9th Cir. 2003) ..................................................................... 9

Laub v. United States Department of Interior, 342 F.3d 1080 (9th Cir. 2003)............................ 9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................. 3, 5, 9

**iv**

*Mont. Shooting Sports Ass'n v. Holder*,
   727 F.3d 975 (9th Cir. 2013) ......................................................................... 26

*Navajo Nation v. U.S. Dep't of Interior*,
   819 F.3d 1084 (9th Cir. 2016) ....................................................................... 18

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................................... 9, 23

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ................................................................................... 5, 10

*Organic Consumers Ass'n v. Sanderson Farms, Inc.*,
   284 F. Supp. 3d 1005 (N.D. Cal. 2018) ......................................................... 14

*Parsons v. United States Dep't of Justice*,
   878 F.3d 162 (6th Cir. 2017) ........................................................................ 22

*Rattlesnake Coal. v. U.S. E.P.A.*,
   509 F.3d 1095 (9th Cir. 2007) ........................................................... 16, 18, 20

*Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) .................................................................. 13, 14

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Commission*,
   324 F.3d 726 (D.C. Cir. 2003) ...................................................................... 22

*Renne v. Geary*,
   501 U.S. 312 (1992) ........................................................................................ 5

*S. Calif. Hous. Rights Ctr. v. Krug*,
   564 F. Supp. 2d 1138, 1152-53 (C.D. Cal. 2007) .......................................... 11

*Sackett v. E.P.A.*,
   566 U.S. 120 (2012) ...................................................................................... 20

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) ..................................................................... 6, 9

*San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*,
   817 F.3d 653 (9th Cir. 2016) ..................................................................... 5, 23

*San Francisco Herring Ass'n v. Dep't of the Interior*,
   946 F.3d 564 (9th Cir. 2019) ......................................................... 16, 18, 19, 21

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
   848 F.3d 1216 (9th Cir. 2017) ........................................................................ 6

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n.*,
   449 F.3d 1016 (9th Cir. 2006) ........................................................................ 5

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ...................................................................................... 13

*Sierra Club v. Penfold*,
   857 F.2d 1307 (9th Cir. 1988) ................................................................. 27, 28

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ............................................................ 12, 13, 14

*Slayman v. FedEx Ground Package Sys., Inc.*,
    765 F.3d 1033 (9th Cir. 2014) .................................................................... 10

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ............................................................... 11, 13

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) ...................................................................... 14

*Sun Sav. & Loan Ass'n v. Dierdorff*,
    825 F.2d 187 (9th Cir. 1987) ........................................................................ 3

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) ...................................................................... 5

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    136 S.Ct. 1807 (2016) ........................................................................... 17, 20

*United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996).................................................................................... 10

*United States v. Glenn-Colusa Irr. Dist.*,
    788 F. Supp. 1126 (E.D. Cal. 1992).............................................................. 27

*United States v. Rainbow Family*,
    695 F. Supp. 314 (E.D. Tex. 1988) .............................................................. 27

*Villa v. Maricopa Cty.*,
    865 F.3d 1224 (9th Cir. 2017) ............................................................... 10, 11

*Warth v. Seldin*,
    422 U.S. 490 (1975).................................................................................... 10

*Wash. v. U.S. Dep't of Homeland Sec.*,
    No. C19-2043-TSZ, 2020 WL 1819837 (W.D. Wash. Apr. 10, 2020) ......... 16, 17, 19, 21

*We Are America/Somos America, Coal. of Ariz. v. Maricopa Cty. Bd. of Supervisors*,
    809 F. Supp. 2d 1084 (D. Ariz. 2011) ................................................. 11, 13, 14

*Western Watersheds Project v. Grimm*,
    921 F.3d 1141 (9th Cir. 2019) ...................................................................... 9

*Western Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ................................................................ 6, 8, 9

*Whitman v. Am. Trucking Associations*,
    531 U.S. 457 (2001).................................................................................... 19

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ...................................................................... 15

*WildEarth Guardians v. U.S. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) ...................................................................... 6

**Statutory Authorities**

5 U.S.C. § 551(4) ........................................................................................................ 17

5 U.S.C. § 551(6) ........................................................................................................ 16

5 U.S.C. § 551(11)(A) ................................................................................................. 17

5 U.S.C. § 551(13) ...................................................................................................... 15

5 U.S.C. § 702 .............................................................................................................. 3

5 U.S.C. § 706(1) ........................................................................................................ 22

42 U.S.C. § 4331(a) ...................................................................................................... 8

42 U.S.C. § 4332(2)(C) .............................................................................................. 12

**Rules and Regulations**

36 C.F.R. §§ 218.21, 220.7 ........................................................................................ 29

40 C.F.R. § 1508.1(q) ........................................................................................... 28, 29

40 C.F.R. § 1508.1(q)(1)(iv) ...................................................................................... 27

40 C.F.R. § 1508.1(q)(2) ............................................................................................ 24

40 C.F.R. § 1508.1(q)(3)(iii) ...................................................................................... 24

40 C.F.R. Parts 1505.1 ............................................................................................... 24

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) .......................................................................... 5

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 2

Statues and Combating Recent Criminal Violence, 85 Fed. Reg. 40081 ...................... 2

**Other Authorities**

*https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%2002 3-01-001-01%20Rev%2001_508compliantversion.pdf* (last visited February 11, 2021) ........................................................................................................................ 24

## INTRODUCTION AND BACKGROUND

In June 2020, former President Trump issued an Executive Order stating, "the Secretary of Homeland Security shall provide … personnel to assist with the protection of Federal monuments, memorials, statues, or property."  Exec. Order No. 13933, Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence, 85 Fed. Reg. 40081 § 5 (Jun. 26, 2020) ("Exec. Order 13933"); (Compl. (Dkt. 1) ¶¶ 50-51).  In response, Defendants Department of Homeland Security ("DHS") and former-Acting Secretary Wolf ("Wolf") took several actions, including:

> (1) establishing the Protecting American Communities Task Force ("PACT");
>
> (2) deploying over 100 law enforcement officers and agents to Portland to quell protects and protect federal property;
>
> (3) arming officers and agents with tear gas and other munitions ("chemical munitions") with the expectation the chemical munitions would be used to fulfill the objectives of Operation Diligent Valor; and
>
> (4) failing to prepare an Environmental Assessment ("EA"), Environmental Impact Statement ("EIS"), or otherwise act in accordance with Defendants' own policies and National Environmental Policy Act ("NEPA") requirements.

(*See, e.g.*, Compl. ¶¶ 17-19, 52-54, 62, 66, 70.)  Plaintiffs refer to these actions individually and collectively as the implementation of Operation Diligent Valor.

This is not a constitutional case challenging free expression or excessive force.  This case is limited in scope to Defendants' statutory obligations under NEPA, which Congress passed to ensure major federal actions like Operation Diligent Valor consider and mitigate harm that those actions may cause to human and environmental health.  NEPA claims are reviewed under the Administrative Procedure Act ("APA").

## LEGAL STANDARDS

To survive such a challenge under FRCP 12(b)(6), Plaintiffs merely need to state a claim "that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl.*

**Page 2 -   PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

*Corp. v. Twombly*, 550 U.S. 544 (2007)).  A claim is plausible on its face if it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.  The Court must construe all allegations of the complaint in the plaintiff's favor. *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987). In deciding the motion, the Court may take into account documents whose contents are alleged in a complaint but were not physically attached. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012).

## POINTS AND AUTHORITIES

### I.   Plaintiffs have standing.

Plaintiffs and their members are adversely affected and aggrieved by the DHS' actions and have standing to bring this suit.  5 U.S.C. § 702 (person suffering legal wrong or adversely affected by agency action entitled to judicial review). The test for individual and organizational standing is the same.  *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378-79 (1982) (citation omitted); *La Asociacion de Trabajadores de Lake v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (internal quotation marks and citations omitted).  For constitutional standing, a plaintiff must demonstrate (1) an injury-in-fact, meaning that an injury is "concrete and particularized" and "actual or imminent," at the time plaintiff filed suit, (2) the alleged injury is "fairly traceable" to the defendants' conduct, and (3) it is "likely, as opposed to merely speculative" that the injury is judicially redressable.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Here, Defendants do not dispute causation in their motion.

### A.   Defendants' harms to Plaintiffs' members are actual and imminent.

Plaintiffs have plainly demonstrated actual and imminent harm.  It is especially poignant that less than two weeks after Defendants filed their Motion to Dismiss, Defendants *again* used chemical munitions against the public which included members of Plaintiff organizations. (Supp. Standing Decl. of Juniper Simonis, Willamette Riverkeeper Member ("Supp. Decl. Simonis") ¶¶ 6-10 ("DHS agents have exposed me to large amounts of chemical and impact munitions, including HC smoke grenades, on multiple occasions since the filing of this lawsuit,

including on January 20, 2021, and January 23, 2021, in the south waterfront neighborhood of Portland."); Standing Decl. of Kate Sharaf, 350PDX Member ("Decl. Sharaf") ¶¶ 3-6.)[1] Plaintiffs' threatened injuries absolutely remain "certainly impending" and well beyond the merely possible. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Declarations from Plaintiffs' members include numerous examples of harm. (*See e.g.* Standing Decl. of Indigo Namkoong (Dkt. 18) ("Decl. Namkoong") ¶¶ 11, 12; Standing Decl. of Brenna Bell (Dkt. 14) ("Decl. Bell") ¶¶ 9-11; Standing Decl. of Kristin Teigen, Neighbors for Clean Air Member (Dkt. 17) ("Decl. Teigen") ¶¶ 8-12; Standing Decl. of Mary Peveto, Executive Director for Neighbors for Clean Air (Dkt. 15) ("Decl. Peveto") ¶¶ 11-13, 17; Standing Decl. of Gordon Essex Noble, Jr., Willamette Riverkeeper Member (Dkt. 12) ("Decl. Noble") ¶¶ 11-14; Standing Decl. of Travis Williams, Executive Director of Willamette Riverkeeper (Dkt. 10) ("Decl. Williams") ¶¶ 16, 18, 20; Standing Decl. of Juniper Simonis, Willamette Riverkeeper Member (Dkt. 11) ("Decl. Simonis") ¶¶ 10-17.) Defendants disregard Plaintiffs' members' persisting physical harm, (*see e.g.* Decl. Namkoong ¶¶ 11, 12; Decl. Teigen ¶¶ 8-12; Decl. Peveto ¶¶ 11-13), as well as the impacts of the continued presence of chemical munitions in the environment. *See e.g.* Decl. Simonis ¶¶ 12-21; Supp. Decl. Simonis ¶¶ 6-10, 11-16 (continuing to find chemical munition detritus in downtown Portland and the Willamette River, including "an unexploded weapon … on a sidewalk adjacent to the grounds of [a] school"); Supp. Standing Decl. of Indigo Namkoong, 350PDX ("Supp. Decl. Namkoong") ¶¶ 2-5; Decl. Sharaf ¶¶ 4-6, 7-10 ("[I]n January 2021, DHS officers shot tear gas and other munitions into the Cottonwood School grounds," where her children attend school. "I do not feel safe sending my children back to school[.]"); Standing Decl. of Kristin Teigen, Neighbors for Clean Air ("Supp. Decl. Teigen") ¶¶ 2-5 ("The menstrual irregularities described in my initial declaration continued for approximately two-and-a-half months.… Neither me nor my primary care physician know what chemical(s) I was

---

[1] In addition to initial Standing Declarations filed with the Court along with the Complaint (Dkts. 8-19), Plaintiffs also submit one additional Standing Declaration and five Supplemental Standing Declarations.

**Page 4 -  PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

exposed to.…  I am unwilling to [attend further demonstrations] because of the risks of exposure to chemical weapons.").

Defendants' attempt to argue that Plaintiffs' harms from chemical deployments are not imminent ignores the law and facts.[2]  Defendants cite *Lujan v. Defenders of Wildlife* in arguing that Plaintiffs only alleged "past harm" and have failed to plead facts of "imminent" future injury.  (Fed. Defs.' Mot. to Dismiss Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and Memo. in Support (Dkt. 30) ("Defendants' Motion to Dismiss" or "Mot. to Dismiss") at 14.)  The Supreme Court has held that harms are only "past" harms "if unaccompanied by any continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *Renne v. Geary*, 501 U.S. 312, 320 (1992) (citation omitted); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 825-26 (9th Cir. 2020) (differentiating federal defendants' harm to journalists at Portland protests from the single chokehold in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) because the journalists' injuries were ongoing, part of a pattern that persisted for weeks, and happened more than once).

Other NEPA lawsuits have upheld standing and NEPA review for harms significantly less imminent than what Plaintiffs allege here.  *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n.*, 449 F.3d 1016, 1031 (9th Cir. 2006) (holding threat of terrorist attack on a nuclear facility was not "remote and highly speculative" and rejecting the notion that the security considerations create insulation from NEPA); *see also Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244 (9th Cir. 2017)) (Navy conducted NEPA review for nuclear submarine wharf construction); *San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*, 817 F.3d 653 (9th Cir. 2016) (NEPA review of Department of Defense property development project in downtown San Diego); *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113 (9th Cir. 2012) (NEPA review of biotechnology research facility).

---

[2] Defendants try to package difficulties breathing, asthma attacks, uterine hemorrhaging, menstrual irregularities, and burning eyes as "procedural" harms in a twisted effort to eliminate equitable relief.  (Mot. to Dismiss  at 13.)  The Court should reject Defendants' argument.

**Page 5 -**  **PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

**B.    Defendants' procedural failures harm Plaintiffs' concrete interests.**

NEPA is a procedural statute, designed to protect both procedural rights and threatened concrete interests. *See Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011) ("*Kraayenbrink*"); *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 918 (9th Cir. 2018). Plaintiffs allege Defendants violated NEPA's procedural rules. (Compl. ¶¶ 16-20, 33-48, 122-132); Dkt. 8-19 (Standing Declarations.) To establish injury in fact in the context of a procedural error, a plaintiff must show "(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interest." *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017), *as corrected* (Mar. 23, 2017) (alterations in original) (citation omitted).

Defendants fail to acknowledge that when a plaintiff alleges, as they do here, a procedural injury, the standing inquiry "is softened," *id.* (citation omitted), because "the causation and redressability requirements [for standing] are relaxed." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (internal quotation marks and citation omitted); *see also Salmon Spawning & Recovery All. v. Gutierrez,* 545 F.3d 1220, 1226 (9th Cir. 2008) (a plaintiff "must show only that they have a procedural right that, if exercised, *could* protect their interests.") (emphasis original) (internal quotation marks and citation omitted). Because Defendants conducted no NEPA analysis, Plaintiffs easily meet the relaxed injury standard. *See City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir. 1975) (the risk that environmental consequences will be overlooked due to failure to prepare an EIS "is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have"). Plaintiffs have a right of action under NEPA and allege DHS did not conduct an environmental review. Nothing more is required.

**C.    Defendants harm Plaintiffs' concrete interests.**

Plaintiffs here have alleged concrete interests in their use and enjoyment of downtown Portland and the Willamette River where DHS deploys chemical munitions as part of Operation Diligent Valor, including for recreational and constitutionally protected activities.  "'In NEPA cases, we have described [the] concrete interest test as requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact.'"  *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001) (internal quotation marks and citation omitted).  That is, environmental plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected. *Citizens for Better Forestry v. U.S. Dep't of Agric.* 341 F.3d 961, 971 (9th Cir. 2003).  Plaintiffs have also shown it is more than "reasonably probable" Defendants' implementation of Operation Diligent Valor threatens Plaintiffs' concrete interests in the local environment.  (*See, e.g.,* Decl. Williams ¶¶ 11-20; Decl. Noble ¶¶ 6-14; Decl. Simonis ¶¶ 9, 10, 12; Standing Declaration of Lisa Leithauser, Neighbor for Clean Air Member (Dkt. 16) ("Decl. Leithauser") ¶¶ 4-5; Standing Declaration of Josh Laughlin, Executive Director of Cascadia Wetlands (Dkt. 13) ("Decl. Laughlin") ¶¶ 5-7; Decl. Teigen ¶ 4; Standing Declaration of Dominica Navarro, Northwest Center for Alternatives to Pesticides Staff and Member (Dkt. 9) ("Decl. Navarro") ¶ 4; Decl. Namkoong ¶ 12; Decl. Sharaf ¶¶ 8-11.) Operation Diligent Valor also threatens Plaintiffs' interests in the wildlife and ecological health within the Willamette River.  (*See, e.g.,* Decl. Williams ¶¶ 8-24; Decl. Noble ¶¶ 9-14; Decl. Simonis ¶¶ 7, 19.)

Plaintiffs also sufficiently allege concrete interests in their health and safety as impacted by DHS' deployments of chemical munitions in downtown Portland.  (*See, e.g.,* Decl. Namkoong ¶¶ 11-15; Decl. Noble ¶¶ 11, 12; Decl. Leithesauer ¶¶ 8-15;  Decl. Peveto ¶¶ 11-19; Decl. Teigen ¶¶ 8-17; Decl. Bell ¶¶ 8-14; Decl. Laughlin ¶ 11; Decl. Williams ¶¶ 22, 24; Decl. Navarro ¶¶ 8-11; Standing Declaration of Ashley Chesser, Executive Director of Northwest Center for Alternatives to Pesticides Staff and Member (Dkt. 8) ("Decl. Chesser") ¶¶ 9-15.) Defendants' sustained, repeated, high-volume use of tear gas and other chemical munitions is

impacting the human environment of downtown Portland, and Plaintiffs' members continue to

suffer and carry the effects with them, even after leaving the area. Thus, Plaintiffs suffer concrete

injuries.

Plaintiffs also sufficiently allege Operation Diligent Valor threatens their interests in

engaging in protected protest.  (*See, e.g.,* Decl. Navarro ¶¶ 6-12; Decl. Bell ¶¶ 6-11; Decl. Teigen

¶¶ 8-14; Decl. Peveto ¶¶ 11-17; Decl. Leithesauer ¶¶ 9-11; Decl. Namkoong ¶¶ 7-13.)

The interests discussed above are the exact types of interests that NEPA was designed to

protect.  *See Kraayenbrink*, 632 F.3d at 485; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

*(TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in

fact when they aver that they use the affected area and are persons for whom the aesthetic and

recreational values of the area will be *lessened* by the challenged activity.") (emphasis added)

(internal quotation marks and citations omitted).  NEPA declares an overarching national policy

to "use all practicable means and measures … to foster and promote the general welfare, to

create and maintain conditions under which man and nature can exist in productive harmony, and

fulfill the social, economic and other requirements of present and future generations of

Americans."  42 U.S.C. § 4331(a).  NEPA further emphasizes that in carrying out these policies,

the federal government has a continuing responsibility "to use all practicable means … to

improve and coordinate Federal plans, functions, programs, and resources to the end that the

Nation may," among other things "fulfill the responsibilities of each generation as trustee of the

environment for succeeding generations," "assure for all Americans safe, healthful, productive,

and esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial

uses of the environment without degradation, risk to health or safety, or other undesirable and

unintended consequences."  *Id*. § 4331(b).  Plaintiffs' allegations of injury are more than

sufficient.

**D.    This Court can redress the injuries Defendants are inflicting on Plaintiffs.**

Defendants misdirect the Court on the redressability prong.  As discussed above, the

Ninth Circuit has a "relaxed" standard for redressability for procedural harm.  *Kraayenbrink*, 632

F.3d at 485 (9th Cir. 2011); *Lujan*, 504 U.S. at 572, n.7; *Cantrell*, 241 F.3d at 682; *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003). A plaintiff only needs to prove that it is "likely," as opposed to "merely speculative," that its injuries will be redressed by a favorable decision. *Laidlaw*, 527 U.S. at 180-81; *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted).

Here, a favorable decision from this Court will require Defendants to undertake a NEPA review of their actions under Operation Diligent Valor. That review alone would redress Plaintiffs' injuries. The ultimate outcome of that analysis is of no consequence. *Lujan*, 504 U.S. at 572; *Salmon Spawning & Recovery All.*, 545 F.3d at 1226. Defendants may, as a result of that analysis, decide to not deploy chemical munitions, clean up spent munitions, or try to find a way to mitigate the impacts the munitions have on the human environment. Any of these outcomes would go towards protecting Plaintiffs' interests. *See Western Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019); *see also Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1254 (D. Mont. 2005) ("*FSEEE*") (where the agency has failed to conduct the requisite NEPA analysis, Courts have the authority to "compel the agenc[y] to" comply with NEPA (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) ("*SUWA*")). Plaintiffs' injuries are redressable.

In arguing against redressability Defendants ignore key facts and mischaracterize Plaintiffs harms as "past" harms, but this is simply untrue. Harms to Plaintiffs persist. (*See, e.g.*, Compl. ¶¶ 43, 44, 74, 79, 80, 83, 91-94, 111 (effects of chemicals likely linger, unknown or uncertain risks continue to exist, chemicals transported to the Willamette River);[3] *see also* Supp. Decl. Simonis ¶¶ 11-13 (continuing to find and clean up chemical weapon debris).) Defendants also remain on the streets of Portland using chemical munitions against members of the Plaintiff organizations, including as recently as January 20, 23, and 27, 2021. (*See* Supp. Decl. Simonis ¶¶ 6-8; Decl. Sharaf ¶¶ 7-9.) Even if the Court were to view DHS' actions as wholly past, the

---

[3] Even if effects do not prove immediate, a plaintiff has standing. *See Laub v. U.S. Dept. of Interior*, 342 F.3d 1080, 1086-87 (9th Cir. 2003).

**Page 9 -    PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

"continuing, present adverse effects" provide standing. *Villa v. Maricopa Cty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea*, 414 U.S. at 495-96). In any case, "[w]hen evaluating whether [the standing] elements are present, we must look at the facts as they exist at the time the complaint was filed." *Slayman v. FedEx Ground Package Sys., Inc*., 765 F.3d 1033, 1047–48 (9th Cir. 2014) (alteration in original). Defendants' activities are not past, harmful effects continue, and while Defendant may want to put Operation Diligent Valor behind them, nothing about Operation Diligent Valor is "past" Plaintiffs or their members.

E.    **Defendants' failure to comply with NEPA frustrates Plaintiffs' missions and diverts Plaintiffs' resources.**

An organization has standing to redress its members' injuries when (1) members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552-54 (1996); *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). The Complaint and declarations demonstrate Plaintiff organizations have representational standing, which suffices the jurisdictional requirements for this Court to hear this case. *Laidlaw*, 528 U.S. at 181. Independent of that, Plaintiff organizations also satisfy direct standing requirements.[4]

Where an organization asserts Article III standing on its own behalf, without invoking the rights of third-party individuals, it must show Defendants' behavior frustrated its mission and caused it to divert resources in response to that frustration of purpose. *Fair Hous. of Marin v. Combs,* 2000 WL 365029 (N.D. Cal. Mar. 29, 2000) ("*Marin I*"), *aff'd*, 285 F.3d 899, 905 (9th Cir. 2002) ("*Marin II*"); *East Bay Sanctuary Covenant, et al. v. Barr,* 964 F.3d 832, 843-46 (9th

---

[4] None of the cases Defendants cite in their challenge to direct standing are NEPA cases, but fair housing or immigration law disputes. Plaintiffs did not find any NEPA cases analyzing direct standing. In fact, it appears that the vast majority of courts are satisfied standing is shown through associational standing where members' interests are germane to the organization's purpose.

**Page 10 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

Cir. 2020); *see also Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (frustration of mission and diversion of resources analysis applies only to Article III standing). The bar, as this Court held, is "relatively low" and "there is no 'threshold magnitude' for the injuries that must be asserted."  *Las Americas Immigrant Advocacy Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1204-05 (D. Or. 2020) (Immergut, J.) (citations omitted) ("One less client, or an injury that 'amount[s] to pennies' is enough."); *see also Am. Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027, 1032-34 (9th Cir. 2007) (merely "interfering" with membership solicitation and communication sufficient to confer standing); *Havens*, 455 U.S. at 379 (where defendant "perceptibly impaired" plaintiff organization's mission, "there can be no question that [it] has suffered injury in fact.").  Defendants improperly propose a higher standard that has no basis in caselaw, is incorrect at the Motion to Dismiss stage,[5] and that ignores the allegations made in the Complaint and declarations.

### 1.      Frustration of mission.

Frustration of mission injuries represent future costs that an organization will be required to expend to rectify or counterbalance the negative impacts of a defendant's actions on an organization's non-economic interests.  *See, e.g., Havens,* 455 U.S. at 379 n. 20; *Marin I*, 2000 WL 365029, at *4; *S. Calif. Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1149, 1152-53 (C.D. Cal. 2007).  In *Smith*, the Ninth Circuit looked to the allegations of the complaint and held, "[a]ny violation of the [Fair Housing Act] by definition frustrates the mission of a fair housing organization whose goals include the elimination of housing discrimination."  *Smith*, 358 F.3d at 1105 (emphasis added); *see also Fair Hous. Council of Or. v. Travelers Home and Marine Ins. Co.*, No. 3:15-CV-00925-SB, 2016 WL 7423414, at *3 (D. Or. Dec. 2, 2016), *report and recommendation adopted*, 3:15-CV-925-SI, 2017 WL 90373 (D. Or. Jan. 10, 2017) (calling the Ninth Circuit's standard in *Smith* a "significantly relaxed" version of the *Havens* standard).

---

[5] At the motion to dismiss stage, an organization need not strictly and literally adhere to the "frustration of mission" and "forced diversion of resources" language to sufficiently allege injury in fact.  *See, e.g.*, *We Are America/Somos America, Coal. of Ariz. v. Maricopa Cty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1096 (D. Ariz. 2011).

**Page 11 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

Similarly here, any violation of NEPA violates the missions of Plaintiff organizations dedicated to the environment and human health of Portland, the Willamette River Basin, and the Pacific Northwest.  Compl. ¶¶ 25-29.  All Plaintiff organizations' missions relate to "the human environment," which is exactly what Congress intended NEPA to protect (*see* 42 U.S.C. § 4332(2)(C)), and what Plaintiffs allege in the Complaint.  (*See e.g.,* Compl. ¶¶ 32, 37.)  Defendants' argument that the frustration be "central" or "fundamental" to an organization's purpose is simply not the standard.

The Ninth Circuit has broadly interpreted mission "frustration" and confirmed standing for conservation groups.  In *Sierra Club*, the Ninth Circuit held the plaintiff organizations "easily" satisfied the frustration of mission requirement because their members' environmental, aesthetic, recreational, cultural, and liberty interests in using and recreating along the U.S.-Mexico border were germane to the Sierra Club's purpose.  *Sierra Club v. Trump*, 963 F.3d 874, 885-86 (9th Cir. 2020).  The Ninth Circuit has also found standing when information was denied which frustrated the organization's purpose.  *See El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (legal services had standing to challenge government policy of not providing translations of proceedings).  Here, federal actions under NEPA *require* the identification, public disclosure, and analysis of information and for this information to be used by the agency to conduct environmental review.  42 U.S.C. § 4332(2)(C).  Failure to conduct NEPA review is a procedural injury (*see* Section I.B. *supra*), and when combined with injury to Plaintiffs' mission, confers organizational standing.  Plaintiff organizations have been unable to respond to member and public inquiries regarding what chemicals were in the munitions, what the human health and environmental impacts are, or how long the chemicals last.

Defendants' vague argument that somehow only "services" qualify for organization's mission is incorrect and unsupported by the caselaw.  (*See* Mot. to Dismiss at 18.)  There are a multitude of ways an organization can divert resources that frustrate its mission.  Where an organization has redirected resources, its mission is frustrated and it has suffered more than a

**Page 12 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

simple "setback" to its abstract social interests.  *See, e.g., Marin II*, 285 F.3d at 903

(organization's identification and counteraction of discriminatory practices was sufficient to

frustrate the plaintiff's counseling and referral services (a concrete injury) and was far more than

simply a setback to abstract social interests); *see also Havens*, 455 U.S. at 379 (citing *Sierra

Club v. Morton*, 405 U.S. 727, 739 (1972)).

> ## 2.    Diversion of resources.

A diversion of resources injury is cognizable when an organization is forced to divert

time and resources away from its regular or "core" programs to undertake a particular case.  *See

Marin I*, 2000 WL 365029, at *3.  These are also called "opportunity costs," or activities an

organization had to forego to address a defendant's action.  *Id.* (internal quotation marks and

citation omitted).  The theory is that in order to respond to a defendant's actions, when a plaintiff

organization is forced to divert resources it would have spent in other ways, it necessarily

follows that a plaintiff organization has fewer resources to service the targets of an

organization's mission that the lawsuit does not impact.  *See Comite de Jornaleros de Redondo

Beach v. City of Redondo Beach,* 657 F.3d 936, 943 (9th Cir. 2011); *We Are America/Somos

America, Coal. of Ariz. v. Maricopa Cty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1099 (D.

Ariz. 2011).  The bar to survive a motion to dismiss is relatively low.  *See Smith*, 358 F.3d at

1106; *Havens* 455 U.S. at 379 ("general allegations" or even "no allegations" sufficient); *Combs*

285 F.3d at 90 (simply showing a "drain" on resources is sufficient); *Sierra Club v. Trump*, 963

F.3d at 886 (organizational resources diverted based on "threat" of border wall construction

sufficient.  Where an organization is forced to choose between suffering an injury and diverting

resources to counteract the injury, an organization has standing to sue.  *La Asociacion De

Trabajadores de Lake*, 624 F.3d at 1088 n.4 (citations omitted).

Plaintiffs submitted declarations from each organization's executive director discussing

resource diversion, (*see* Decl. Chesser; Decl. Williams; Decl. Laughlin; Decl. Peveto; and Decl.

Namkoong), and the Complaint references work Plaintiff organizations undertook to identify

chemicals and attempt to get official responses.  (Compl. ¶¶ 94-99, 107, 109, 117-119.)

**Page 13 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO
    DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM
    IN SUPPORT**

Plaintiffs submit Supplemental Standing Declarations of Ashely Chesser ("Supp. Decl. Chesser"), Travis Williams ("Supp. Decl. Williams"), and Indigo Namkoong further detailing their resource diversions.

There are a litany ways an organization's diversion of resources may satisfy the Article III standing diversion of resources requirement. Some common examples include: staff time, monitoring or counteracting problematic action, advocacy efforts like public outreach and education, diverting resources from other efforts, calls to action, expenditures to create and disseminate literature, monetary costs, opportunity costs, providing services to ameliorate hardships created, diversion of resources from other goals, etc. *See, e.g., Sierra Club v. Trump*, 963 F.3d at 886; *Marin II*, 285 F.3d. at 899, 903, 904-05; *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012); *El Rescate Legal Servs.*, 959 F.2d at 748; *Las Americas Immigrant Advocacy Ctr.*, 475 F. Supp. 3d at 1204-05; *Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990); *Organic Consumers Ass'n v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005, 1011 (N.D. Cal. 2018); *Comm. For Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1185, 1195 (N.D. Cal. 2009); *We Are America*, 809 F. Supp. 2d at 1099. The general restrictions are that a diversion of resources cannot be a litigation cost, *see, e.g., Comite de Jornaleros de Redondo Beach*, 657 F.3d at 943, nor can it be on a problem that would not otherwise affect the organization, *see, e.g., La Asociacion De Trabajadores*, 624 F.3d at 1088, or an anticipated future spending cost.

As a result of Defendants' use of chemical munitions, Plaintiff organizations have had to divert and expend resources from matters unrelated to this NEPA litigation. *See* Supp. Decl. Chesser ¶¶ 3-7 (reprioritization of staff time and communications efforts from other matters to work on identifying chemicals Defendants use); Supp. Decl. Williams ¶¶ 6-9 (reallocation of staff work from other projects ); Supp. Decl. Namkoong ¶ 8 (staff time pivoted from mobilizing around Election Day and contributing to climate justice planning in local government to developing a guide to protect front line protesters and communications with hundreds of

**Page 14 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

volunteers attending protests about safety from chemical munitions).  The targets of the resource diversions do in fact affect the organizations.

## II.    Plaintiffs have pleaded discrete and final agency action.

In DHS' belt and double suspenders approach to their Motion to Dismiss, they argue the implementation of Operation Diligent Valor is not "agency action," "final agency action," or "discrete agency action."  (Mot. to Dismiss at 20-23.)  These cursory challenges fail as a matter of law.  Each of the actions Defendants took to implement Operation Diligent Valor (*see* Introduction and Background section, *supra*) individually and collectively qualify as discrete "final agency action."

### A.    Agency action.

Plaintiffs have sufficiently alleged "agency action," defined in the APA as "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13).  The definition is meant to be "expansive" and "to cover comprehensively every manner in which an agency may exercise its power."  *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (citation omitted); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006).  Relevant to the instant case, the implementation of Operation Diligent Valor as alleged in the Complaint qualifies as an agency "order, "rule," "relief," and "failure to act" as those terms are defined in the APA.

### 1.    Implementation of Operation Diligent Valor as "failure to act."

The implementation of Operation Diligent Valor qualifies as "failure to act" under the APA.  In a "failure to act" case, judicial review is appropriate if the plaintiff makes a showing of "agency recalcitrance ... in the face of clear statutory duty or ... of such a magnitude that it amounts to an abdication of statutory responsibility."  *Audubon Soc. of Portland v. Jewell*, 104 F. Supp. 3d 1099, 1102 (D. Or. 2015) (internal quotation marks and citation omitted).

Plaintiffs' allegations that DHS failed to prepare required environmental documents (EA and EIS) and act in accordance with defendants' own policies and NEPA requirements, (Compl.

**Page 15 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

¶¶ 17-19) are sufficient to qualify as "failure to act." *See Hall v. Norton*, 266 F.3d 969, 975 n.5 (9th Cir. 2001) ("[T]he BLM's decision not to prepare an EIS is a final agency action."); *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("[A]n agency's decision not to issue an EIS concludes the agency's procedural inquiry into the environmental impact of a proposed project and therefore constitutes a final agency action[.]") (citation omitted); *FSEEE*, 397 F. Supp. 2d at 1252 ("[T]he USFS decision not to prepare an EIS or consult NEPA can itself be a 'final agency action.'") (citation omitted).

### 2.    Implementation of Operation Diligent Valor as an "order."

The implementation of Operation Diligent Valor also qualifies as an "order," defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing[.]". 5 U.S.C. § 551(6). In an effort to "answer[] the President's call" set out in the Executive Order, Defendants began implementation of Operation Diligent Valor with a DHS directive deploying heavily armed personnel and agents. (*See* Complaint § 52 (referencing the PACT directive)[6].) This directive fits within the APA's definition of an "order." *See Wash. v. U.S. Dep't of Homeland Sec.*, No. C19-2043-TSZ, 2020 WL 1819837, at *4 (W.D. Wash. Apr. 10, 2020) (*"Wash. v. DHS"*) (holding U.S. Immigration and Customs Enforcement's ("ICE") "directive" authorizing ICE agents to make civil immigration arrests inside courthouses was "final agency action"); *Faith Int'l Adoptions v. Pompeo*, 345 F. Supp. 3d 1314, 1324 (W.D. Wash. 2018) (emails from U.S. Department of State providing "clarification" of its regulations was likely a "directive" that was "final agency action" because it "constituted an interpretive shift that was the final result of the agency's decision-making process."); *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 582 (9th Cir. 2019) (*"SF Herring"*) (holding plaintiffs

---

[6] *See* DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues, https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-to-protect-american-monuments-memorials-and-statues (last visited Feb. 11, 2021).

**Page 16 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

sufficiently pleaded "agency action" where Herring Association members brought suit challenging "formal notices" by the National Park Service prohibiting commercial fishing).

### 3.    Implementation of Operation Diligent Valor as a "rule."

The implementation of Operation Diligent Valor also qualifies as a "rule," defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy…."). 5 U.S.C. § 551(4). Defendants' public pronouncement on July 1, 2020 was an agency statement of general and particular applicability that had obvious future effects to implement the former President's Executive Order, interpret the Executive Order and existing law, and to prescribe DHS' new policy. (*See* Compl. § 52); *see also Wash. v. DHS*, 2020 WL 1819837, at *5 ("A policy, however, need not be written, or even made known to the public, to be judicially reviewable.") (citation omitted). Additionally, even the decision to deploy DHS agents to Portland to implement Operation Diligent Valor was a "jurisdictional determination" sufficient to constitute a "rule." *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S.Ct. 1807, 1814 (2016) (by issuing a "standalone jurisdictional determination" concerning whether a property contains "waters of the United States" under the Clean Water Act, the Army Corps of Engineers' actions were a "rule" under the APA).

### 4.    Implementation of Operation Diligent Valor as "relief."

The implementation of Operation Diligent Valor also qualifies as "relief," defined as the "whole or part of an agency grant of money, *assistance*, license, authority, exemption, exception, privilege, or remedy" 5 U.S.C. § 551(11)(A) (emphasis added). The Executive Order authorized DHS to "provide, as appropriate and consistent with applicable law, personnel to *assist with* the protection of Federal Monuments, memorials, statues, or property." Exec. Order 13933 § 5; (Compl. ¶ 51). In context, "assist" here means providing assistance to State and local law enforcement officials who are ordinarily responsible to enforce the law and protect public monuments, memorials, statues, and other federal properties. *See* Exec. Order 13933, §§ 1, 2(d),

2(e), 3(b), and 4.  The July 1, 2020 PACT directive committed DHS and its resources to such

assistance, and DHS personnel eventually provided this type of assistant to local law

enforcement in Portland.

### 5.    Basic fairness requires the Court's review.

Given the agency's unprecedented actions of literally putting boots-on-the-ground and

discharging chemical munitions against public protesters, denying judicial review here would

undermine "basic fairness," particularly where Plaintiffs allege violation of a law designed to

protect human health and the environment,  *See SF Herring*, 946 F.3d at 575 ("It raises questions

of basic fairness for the Park Service to assert its jurisdiction over the fishermen and bring them

to the precipice of punishment, only to later claim there is nothing conclusive here for the

fishermen to even challenge.  The APA's judicial review provisions prevent precisely this 'heads

I win, tails you lose' approach.").

### B.    Final Agency Action.

The implementation of Operation Diligent Valor is also "final" agency action.  Under the

*Bennett* test, an "agency action is 'final' when (1) the agency reaches the 'consummation' of its

decisionmaking process and (2) the action determines the 'rights and obligations' of the parties

or is one from which 'legal consequences will flow.'"  *Rattlesnake*, 509 F.3d at 1103 (citing

*Bennett v. Spear*, 520 U.S. 154, 177 (1970)).  The finality determination considers "both legal

and practical consequences."  *Las Americas Immigrant Advocacy Ctr*, 475 F. Supp. 3d at 1216

(citation omitted).

### 1.    Consummation of decisionmaking process.

Under Ninth Circuit caselaw, Defendants' decisionmaking is sufficiently consummated to

satisfy the first *Bennett* prong.  First, Defendants' determination that DHS has *jurisdiction* to

create the PACT and deploy agents to assist with protecting federal properties (Complaint ¶¶ 52-

53) constitutes final agency action.  *See Navajo Nation v. U.S. Dep't of Interior*, 819 F.3d 1084,

1091 (9th Cir. 2016) (for "first *Bennett* requirement, an agency's determination of its jurisdiction

is the consummation of agency decisionmaking regarding that issue."). Additionally, the July 1,
2020 PACT directive to deploy agents show the decisionmaking process was consummated at
least by early July 2020.  *See Wash. v. DHS*, 2020 WL 1819837, at *4 (holding ICE's directive
authorizing civil immigration arrests inside courthouses satisfies *Bennet* test because it
"constitutes ICE's most recent and 'final' word on who may be arrested *inside a courthouse*[.]")
(emphasis in original).

Second, the method and content of the July 1, 2020 PACT directive to deploy agents
(Compl. ¶¶ 52-53) is the type of "formal notice" that courts recognize as final agency action.  *SF
Herring*, 946 F.3d at 579-81 (when agency states a "definitive position in formal notices,
confirm[s] that position orally, and then send[s] officers out into the field to execute on the
directive," then the decisionmaking process is "clearly consummated. … By taking the additional
step of enforcing its formal notices against the fishermen, the in-water 'no fishing' orders
reflected … the 'consummation of the agency's decisionmaking process[.]'") (citation omitted).

Third, even if the "agency has not dressed its decision with the conventional procedural
accoutrements of finality," the agency's "own behavior" can "belie[] the claim that its
interpretation is not final.  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478-79 (2001).
Despite multiple lawsuits (including this one), negative international attention (Compl. ¶ 72), and
a recent change in Presidential and agency leadership, DHS' continued use of the munitions into
2021 illustrates the agency views its decision as final.

Finally, the decision to arm agents with chemical munitions for use in defending federal
properties is also considered consummated agency action.  *See FSEEE*, 397 F. Supp. 2d at 1252
(U.S. Fire Services' "decision to use chemical fire retardant" to fight wildfires "is the
consummation of the agency's decisionmaking, this decision is not tentative or interlocutory,
[and] the agency does not intend to change its mind[.]")  Defendants' attempt to minimize the
use of chemical munitions as merely "the decisions of individual law enforcement personnel
[whether] to use" (Mot. to Dismiss at 22) ignores the role of DHS in providing the munitions,
training the agents, and giving agents authority to use munitions.  *See FSEEE*, 397 F. Supp. 2d at

**Page 19 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO
DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM
IN SUPPORT**

1251 (holding that case-by-case decisions by local incident commanders to use chemical fire retardants was still "final agency action" and not insulated from NEPA's requirements).

Defendants also argue their actions are not final because the "deployment of law enforcement personnel… can (and should) be augmented, curtailed, adjusted, or rescinded at any time within the discretion of the agency as circumstances on-the-ground dictate." (Mot. to Dismiss at 22.) This argument—noticeably devoid of *any* case support—also fails. *See Hawkes*, 136 S.Ct. at 1814 (holding the possibility that an agency "may revise" its decision based on "new information" is a "common characteristic of agency action[] and does not make an otherwise definitive decision nonfinal."); *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal.").

### 2.    Rights, obligations, and legal consequences.

The second prong of the *Bennett* test is that agency action is final when "the action determines the 'rights and obligations' of the parties or is one from which 'legal consequences will flow.'" *Rattlesnake*, 509 F.3d at 1103 (citing *Bennett*, 520 U.S. at 177). Again, Ninth Circuit caselaw provides ample support that Defendants' actions satisfy this prong.

Several cases hold that a Defendants' failure to prepare environmental documents satisfies the second prong of the *Bennett* test. *See Hall*, 266 F.3d at 975 n.5 ("[T]he BLM's decision not to prepare an EIS is a final agency action[.]"); *Rattlesnake*, 509 F.3d at 1104 ("[A]n agency's decision not to issue an EIS concludes the agency's procedural inquiry into the environmental impact of a proposed project and therefore constitutes a final agency action[.]") (citation omitted); *FSEEE*, 397 F. Supp. 2d at 1252 ("[T]he USFS decision not to prepare an EIS or consult NEPA can itself be a 'final agency action.'") (citation omitted).

Legal consequences also flow from DHS' decision to use chemical munitions to protect federal properties, including the environmental impact of that decision. *See FSEEE*, 397 F. Supp. 2d at 1252 ("legal consequences" flow from the USFS' decision "to use chemical fire

**Page 20 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

retardant" in fighting wildfires because "chemical retardant has been dumped on [plaintiff employees] and has resulted in fish kills.").

Additionally, legal consequences flow from DHS' decision to target individuals Wolf called "violent anarchists and rioters seek[ing]... to vandalize and destroy... to disrupt law and order and sow chaos...." (Compl. § 52); *see Wash. v. DHS*, 2020 WL 1819837, at *4 (holding ICE's directive authorizing arrests inside a courthouse was final agency action because it had the requisite "legal consequences" for individuals who might be arrested); *SF Herring*, 946 F.3d at 580-81 (by taking "additional step" of enforcing formal notices against fisherman, the orders reflected agency's determination to create "legal consequences" for violators) (internal quotation marks and citation omitted).

The attempted enforcement of dispersal orders, volume of arrests, and use of chemical and other weapons against large swaths of the public, for which Defendant are facing several lawsuits, surely suffice to satisfy the second prong of the *Bennett* test.

### 3. Defendants' "law enforcement investigation" case citations do not establish a lack of final agency action.

Defendants' argument that the implementation of Operation Diligent Valor is merely a "law enforcement action," not final agency action, also fails. (Mot. to Dismiss at 22.) Not only do Defendants cite exclusively non-binding cases from outside of the Ninth Circuit, but the cases cited do not support Defendants' underlying proposition and are easily distinguished from the

instant case.[7]  Plaintiffs' allegations here are not a vague challenge to ancillary law enforcement activities like putting GPS devices on cars, listening to international phone calls without warrants, or listing a potential gang on a government list; instead, Operation Diligent Valor involved a clear directive and order to deploy DHS agents armed with toxic chemicals, without abiding by agency policy or NEPA requirements.  Nor are Plaintiffs' allegations akin to potentially faulty sprinkler heads.  Defendants' citations do not advance their argument and are easily distinguishable legally and factually.

### C.    Discreet agency action.

Argued only in a single footnote, Defendants claim Plaintiffs have failed to challenge "discrete" agency action because the Court is unable to conduct "day-to-day managerial role over agency operations," and Plaintiffs' general challenge is an impermissibly "broad programmatic challenge."  (Mot. to Dismiss at 21 n.2.)  Defendants' cursory challenge fails because Defendants' failure to comply with NEPA is not a "day-to-day managerial" decision, and Plaintiffs are permitted to challenge national policies that fail to comply with NEPA.  "[A] claim under 5 U.S.C. § 706(1) can proceed only where a plaintiff asserts that an agency failed to

---

[7]  *See Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 n.14 (D.D.C. 2015) ("A law enforcement agency's approval of the use of a specific investigative technique in the context of a specific investigation"—a warrantless installation of a GPS device on automobile—"does not constitute final agency action[.]") (citation omitted); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (no "final agency action" where CPSC's conduct merely "amount[ed] to an investigation of appellant's sprinkler heads" for a possible product hazard, "a statement of the agency's intention to make a preliminary determination…, and a request for voluntary corrective action."); *ACLU v. NSA*, 493 F.3d 644, 678 (6th Cir. 2007) (no "agency action" where ACLU challenged the "NSA's warrantless interception of overseas communications" and failure to comply with FISA's requirements because, "the NSA's surveillance activities, as described by the three facts of record, do not constitute, nor are they conducted pursuant to, any agency rule, order, license, sanction, or relief."); *Parsons v. United States Dep't of Justice*, 878 F.3d 162, 164-69 (6th Cir. 2017) (after a 2011 FBI "informational report" labeled the "Juggalos" a "loosely-organized hybrid gang," self-identified Juggalos brought suit under the APA; the court found no "final agency action" because an "informational report" and a third party's reliance on it does not constitute "legal consequences" from the report itself).

**Page 22 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

take a *discrete* agency action that it is *required to take.*" *FSEEE*, 397 F. Supp. 2d at 1250

(emphases in original) (citing *SUWA*, 542 U.S. at 64. Plaintiffs have sufficiently alleged

"discrete" agency action under § 706(1), *SUWA*, and other applicable caselaw.

The District of Montana considered this same issue in a case with analogous facts, where

local commanders in charge of wildfires had case-by-case discretion to use "chemical fire

retardants" that were potentially harmful to the environment. *FSEEE*, 397 F. Supp. 2d at 1244.

The *FSEEE* court directly discussed and distinguished *SUWA*, holding the plaintiffs "challenge a

discrete action, the decision to use chemical fire retardant without consulting NEPA. *SUWA*

makes clear that the manner of action is left to the agency's discretion, so that the while federal

courts cannot tell federal agencies exactly what NEPA documents to prepare, they can order

agencies to comply with NEPA." *FSEEE*, 397 F. Supp. 2d at 1251 (citing *SUWA,* 542 U.S. at

65). Despite the lack of a "site specific" challenge in *FSEEE*, the court held that it was not an

impermissible "programmatic attack" under *SUWA* because "the CEQ regulations governing

NEPA specifically allow programmatic environmental impact statements[.]" *FSEEE*, 397 F.

Supp. 2d at 1248. Likewise, Defendants' footnote challenge fails.[8]

---

[8] Defendants offer no support for their meritless argument that Plaintiffs' injuries result from Defendants' "routine" or "day-to-day operations." (Mot. to Dismiss at 2, 21, 23.) Even DHS' Regional Director does not characterize Operation Diligent Valor actions as "routine" or "day-to-day" activities in his declaration. (*See* Declaration of Gabriel Russell (Dkt. No. 30-3).) *San Diego Navy* supports Plaintiffs' position that Operation Diligent Valor is a stand-alone decision. *San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*, 817 F.3d 653, 659 (9th Cir. 2016) (U.S. Navy Broadway Complex property development in San Diego Navy and nuclear facilities in Mothers for Peace "can hardly be classified as 'everyday facilities' as the Federal Defendants assert."). To the extent this Court finds Defendants' activities are "day-to-day" actions, that only supports Plaintiffs' standing and concerns of continual harm from Defendants' chemical munitions. Defendants cannot have it both ways.

**Page 23 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

D.      **Conclusion.**

Contrary to Defendants' unsupported argument that their actions fail to "determine anyone's legal rights *or carry any legal consequence*" (Mot. to Dismiss at 22 (emphasis added)), the Court must review these actions under the APA as discrete and final agency action.

**III.    The implementation of Operation Diligent Valor is a major federal action.**

Defendants finally argue that Operation Diligent Valor is not a "major federal action" that triggers NEPA.  (Mot. to Dismiss at 23-24.)  NEPA's regulations define "major federal action" as "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals."  40 C.F.R. § 1508.1(q)(2).  Specifically, this includes "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or **executive directive**."  40 C.F.R. § 1508.1(q)(3)(iii) (emphasis added).  Here, Operation Diligent Valor plainly fits the definition of "major federal action" as it is the implementation of an agency plan *and* an "executive directive."

DHS also has an Instruction Manual that describes which agency activities are "major federal actions" requiring NEPA analysis.  (*See* Compl. ¶ 17; Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA) ("DHS NEPA Manual")[9] at III-1.)  The DHS NEPA Manual "serves as the DHS implementing procedures for NEPA (as required by 40 C.F.R. Parts 1505.1 and 1507.3) which supplement the CEQ regulations and therefore must be read in conjunction with them."  (*Id.*)  According to DHS' own manual, "NEPA applies to Federal actions that affect the human environment," and "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS."  (*Id.*)  DHS concludes that "NEPA applies to the majority of DHS actions."  (*Id.* at V-1.)

---

[9] Available at *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508compliantversion.pdf* (last visited February 11, 2021).

**Page 24 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

DHS' definition is entitled to deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Indeed, DHS' NEPA manual is binding unless unreasonable. *Id.*

### A. Operation Diligent Valor fits squarely within DHS' own definition of "major federal action."

Defendants tellingly never reference the DHS NEPA Manual and fail to recognize the broad definition of "major federal action." The DHS NEPA Manual specifically states that an Environmental Assessment is "normally" required for "[**n]ew law enforcement field operations** for which the environmental impacts are unknown, for which or any potential significant environmental impacts could be mitigated to the level that they are no longer significant, or for which the potential for significant environmental controversy is likely." (DHS NEPA Manual at V-9 (emphasis added).) DHS further requires NEPA analysis for "activities for actions that are likely to receive high-level executive branch and/or national attention, including those that are likely to require the attention of either the Deputy Secretary or the Secretary." (*Id.* at IV-2.) DHS chose the following factors which *preclude* the agency from exempting action from NEPA review: (1) "A potentially significant effect on public health or safety;" (2) "A potentially significant effect on species or habitats protected by the ESA"; (3) "An effect on the quality of the human environment that is . . . likely to be highly uncertain, or likely to involve unique or unknown environmental risks;" (4) "Extent to which a precedent is established for future actions with significant effects;" (5) or is "Significantly greater scope or size than normally experienced for this particular category of action." (*Id.* at V-6.)[10] Operation Diligent Valor is a new law enforcement field operation being financed and implemented by the Department of Homeland Security that has received high-level executive branch and/or national attention and involves a

---

[10] DHS is right to note that *potential* effects should preclude NEPA exemption. To show that the agency violated its duty to prepare an EIS in the Ninth Circuit, a plaintiff need not show that a significant effect will in fact occur, only that substantial questions are raised as to whether a project may have a significant effect. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (emphasis added) (citation omitted).

**Page 25 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

myriad of potentially significant impacts.  It is exactly the type of major federal action that triggers NEPA.

Plaintiffs make sufficient allegations to show Operation Diligent Valor is a new law enforcement field operation.  As described in the Complaint, "Operation Diligent Valor" is Defendants' novel deployment of federal officers in response to an executive order.  It encompasses several actions, including: (1) establishing PACT to "coordinate Departmental law enforcement agency assets in protecting our nation's historic monuments, memorials, statues, and federal facilities," (Compl. ¶ 52); (2) deploying over 100 law enforcement personnel and agents to Portland with the stated purpose of quelling protects and protecting federal property (*id*. ¶¶ 53-54); and (3) arming the law enforcement personnel and agents with tear gas and other chemicals with the expectation they would be used to fulfill the objectives of Operation Diligent Valor.  (*See e.g.*, *id.* ¶¶ 62, 66, 70).

Plaintiffs also make several allegations as to each factor precluding exemption. Operation Diligent Valor is unprecedented and has garnered worldwide attention.  (*See id.* at ¶¶ 71, 72.)  As alleged in the complaint,[11] Operation Diligent Valor and the accompanying mass deployment of chemical munitions has a potentially significant impact on public health and safety.  (*See id.* ¶¶ 14, 74 -89.)  It has had a potentially significant effect on species or habitats protected by the Endangered Species Act.  (*See id.* ¶¶ 90-108.)  The scale of the deployment of these chemical munitions and washing the tear gas and other chemical munitions residue down Portland's storm drains involves unique or unknown environmental risks.  (*See id.* ¶¶ 109-21.) The domestic deployment of militaristic federal agents to proactively curb public protests sets a dangerous precedent and has garnered international attention for doing so.  (*See id.* ¶¶ 70-72.) Finally, this deployment of field agents and their mass deployment of these chemicals in downtown Portland is significantly more extreme than usual actions taken by state and local

---

[11] "We review a motion to dismiss for lack of standing de novo, construing the factual allegations in the complaint in favor of the plaintiffs."  *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013) (citation omitted).  This factual allegation in Plaintiffs' complaint must be construed in Plaintiffs' favor.

**Page 26 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO**
**DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM**
**IN SUPPORT**

officials.  (*See id.* ¶¶ 53, 64-72.)  Perceived "abdication" of state and local public officials was in fact a stated justification for the deployment of these federal agents.  Exec. Order No. 13933 § 1.

**B.**     **Operation Diligent Valor is not exempt from NEPA.**

Nothing in the DHS NEPA Instruction Manual suggests DHS actions here are exempt. DHS argues that Operation Diligent Valor qualifies for an exemption from NEPA for "[j]udicial or administrative civil or criminal enforcement actions."  (Mot. to Dismiss at 23 (citing 40 C.F.R. § 1508.1(q)(1)(iv)).)  Placing Operation Diligent Valor into this exemption would improperly expand the criminal enforcement exception and undermine NEPA.  The criminal enforcement exception applies to longstanding enforcement actions, not new ones.  None of the cases cited by federal Defendants involve the agency implementation of a new executive order or directive, but instead pertain to agency attempts to enforce long-standing laws or regulations.  *See United States v. Glenn-Colusa Irr. Dist.*, 788 F. Supp. 1126, 1135 (E.D. Cal. 1992) (involved routine enforcement of the Endangered Species Act); *see also Calipatria Land Co. v. Lujan*, 793 F. Supp. 241, 245 (S.D. Cal. 1990) (holding hinged on the fact that the regulation was "not a change in federal policy"); *see also United States v. Rainbow Family*, 695 F. Supp. 314, 324 (E.D. Tex. 1988) (enforcing existing Forest Service regulations against prohibited activities); *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988) (enforcing existing Bureau of Land Management mining regulations).  In fact, these cases stress that "there is no 'program' or 'policy' at issue," *Rainbow Family*, 695 F. Supp. at 324, and that the regulations seeking to be enforced "have been in place for years." *Calipatria,* 793 F. Supp. at 245; *see also Glenn-Colusa Irr. Dist.,* 788 F. Supp. at 1133 (involved fish screen "orders stretching back to the 1920's").  Because Operation Diligent Valor involves the implementation of a new executive order through a targeted plan of action, it falls plainly outside of this exemption.

Specifically, Operation Diligent Valor enacts new policies to "withhold Federal support from State and local law enforcement agencies that have failed to protect public monuments, memorials, and statues from destruction or vandalism," and replace these authorities with newly deployed "personnel to assist with the protection of Federal monuments, memorials, statues, or

**Page 27 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO
                 DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM
                 IN SUPPORT**

property."  Exec. Order No. 13933 § 2(d).  In essence, Operation Diligent Valor sought to federalize traditional state and local law enforcement duties in jurisdictions where the Trump administration believed that "[s]tate and local governments appear to have lost the ability to distinguish between the lawful exercise of rights to free speech and assembly and unvarnished vandalism."  *Id.* § 1.  Granted, the order partially involves the enforcement of existing laws designed to protect federal property, but because Operation Diligent Valor involves federal agency implementation of new policy, and the novel deployment of federal personnel and resources in place of traditional state and local actors, it can hardly be categorized as mere enforcement.  40 C.F.R. § 1508.1(q).  It is also notable that Wolf admitted in an internal memorandum on July 17, 2020, that this type of operation is not one for which officers were previously trained.[12]

### C.    Neither impracticality nor purported emergencies obviate the need for a NEPA analysis.

Finally, DHS argues that "[i]t would be impractical for DHS, or any other federal law enforcement agency, to wait to prepare an EIS, subject the EIS to public comment, and then finalize the EIS, prior to undertaking law enforcement action."  (Mot. to Dismiss at 23.)  But, DHS did not have to wait to conduct NEPA concerning the deployment of chemical munitions. In fact, the DHS NEPA Manual explicitly contemplates that the use of chemical munitions in routine crowd control training would require NEPA analysis for the use of "live chemical, biological, or radiological agents" outside of a controlled training environment. (DHS NEPA Manual at A-11.)  The DHS NEPA Manual also instructs DHS to conduct NEPA at the "earliest possible stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made."  (*Id.* at IV-1.) The DHS NEPA Instruction Manual contemplates that analysis can be conducted proactively and

---

[12] *See Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said*, N.Y. Times, July 18, 2020, available at https://www.nytimes.com/2020/07/18/us/portland-protests.html (last visited Feb. 12, 2021).

**Page 28 -  PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

programmatically for general application.  (*Id.* at V-14.)  The agency could have and should have done NEPA prior to acquiring large volumes of chemical munitions to unleash on the public and environment.[13]

The agency also could have and should have done NEPA prior to the purported emergency need for chemical munitions.  But even if DHS could not have conducted an ordinary NEPA review prior to deployment, it still could have complied with NEPA.  Both DHS and other federal agencies have "emergency situation" NEPA review processes and conduct expedited review to begin project implementation immediately.  (*See, e.g.,* DHS NEPA Manual at VI-1 through VI-3); U.S. Forest Service Emergency Situation Determination (36 C.F.R. §§ 218.21, 220.7, 223.81 (shortening formal advertising notice periods, and allowing projects to proceed without predecisional objection process).  The agency has made no effort to comply with its own directives or proactively analyze the domestic deployment of chemical crowd control munitions, (*see* Compl. ¶¶ 129, 130), and DHS' present complaints about practicality of compliance raised over seven months after initiating Operation Diligent Valor should be ignored.  DHS had, and continues to have, ample opportunity to conduct *some* NEPA analysis but simply refuses to do so.

Defendants arguments are similar to those that an agency presented and that the court rejected in *FSEEE*, 397 F. Supp. 2d at 1248.  There, plaintiffs challenged the Forest Service's failure to conduct NEPA for the deployment of chemical fire retardants in emergency responses to forest fires.  *Id.* at 1244.  The Forest Service argued:

---

[13] This is done regularly with other agencies.  The BLM programmatically issues NEPA documents pertaining to the use and deployment of various herbicides and pesticides involved in federal land management.  *See, e.g.*, Bureau of Land Management, Integrated Vegetation Management Handbook (H-1740-2, Rel. 1-1714) at 70 (2008) (available at https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_Handbook_H-1740-2.pdf (last visited Feb. 11, 2021) ("A project file with NEPA documenta[t]ion and a ROD is developed for each herbicide project"); Bureau of Land Management, Environmental Assessment: Herbicide Application within the Yuma Field Office, DOI-BLM-AZ-C020-2018-0018-EA at 5 (2018) (available at https://eplanning.blm.gov/public_projects/nepa/102241/148567/182423/DecisionRecord.pdf (last visited Feb. 11, 2021).

**Page 29 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

> [B]ecause no national decision mandating the use of chemical fire retardant on any particular piece of land and because the decision to use chemical fire retardant is made by the incident commander, there is no irretrievable commitment of resources, and thus no "major federal action," until this decision is made. Defendants then argue that at this time it is too late to involve NEPA, so the use of chemical fire retardant is immune from NEPA.

*Id.* at 1254.  The Court rejected these arguments as such a wide loophole would permit federal agencies to "circumvent NEPA by delaying the 'irretrievable commitment of resources' until it is too late for NEPA review."  *Id.*  The Court held that "substantial questions are raised as to whether a project may have a significant effect" and compelled the agency to comply with NEPA.  *Id.*  Similarly here, Defendants have argued that it "cannot be expected to spend nearly five years on a public environmental review before such action."  (Mot. to Dismiss at 24 (emphasis omitted).)  Defendants have had decades to conduct programmatic NEPA analysis, its argument that it is too late now for it to conduct that analysis, must fail.  *See FSEEE*, 397 F. Supp. 2d at 1253.

### CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

DATED this 12th day of February, 2021.

MARKOWITZ HERBOLD PC

By:    *s/ Nathan D. Burcham*

Jeffrey M. Edelson, OSB # 880407
JeffEdelson@MarkowitzHerbold.com
Nathan D. Burcham, OSB #182509
NathanBurcham@markowitzherbold.com
Telephone:  (503) 295-3085

Kelly K. Simon, OSB # 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OREGON
Telephone:  (503) 227-6928

Nicholas S. Cady, OSB # 113463
nick@cascwild.org
CASCADIA WILDLANDS
Eugene, OR  97440
Telephone:  (541) 434-1463

**Page 30 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

Elisabeth Holmes, OSB # 120254
eli@willametteriverkeeper.org
WILLAMETTE RIVERKEEPER
Telephone:  (541) 870-7722

Of Attorneys for Plaintiffs

1092239

**Page 31 - PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(6) AND MEMORANDUM IN SUPPORT**

### CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(b)(2)

I certify that this brief complies with the applicable word-count limitation under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 11,767 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED this 12th day of February, 2021.

*s/ Nathan D. Burcham*

_____
Nathan D. Burcham, OSB #182509
NathanBurcham@markowitzherbold.com
Attorney for Plaintiffs