IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NORTHWEST CENTER FOR ALTERNATIVES TO PESTICIDES, WILLAMETTE RIVERKEEPER, CASCADIA WILDLANDS, NEIGHBORS FOR CLEAN AIR, and 350PDX**,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY and CHAD WOLF, in his capacity as Acting Secretary, U.S. Department of Homeland Security**,<br><br>Defendants. | Case No. 3:20-cv-01816-IM<br><br>**OPINION AND ORDER** |

Jeffrey M. Edelson and Nathan D. Burcham, Markowitz Herbold PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201; Kelly K. Simon, ACLU of Oregon, P.O. Box 40585, Portland, OR 97240; Elisabeth Holmes, Willamette Riverkeeper, P.O. Box 293, Eugene, OR 97440; Nicholas Stanton Cady, Cascadia Wildlands, P.O. Box 10455, Eugene, OR 97440. Attorneys for Plaintiffs.

Paul Gerald Freeborne, DOJ-Enrd, ENRD, Natural Resources Section, P.O. Box 7611, Ben Franklin Station, Washington, DC 20044-7611. Attorney for Defendants.

**IMMERGUT, District Judge.**

PAGE 1 – OPINION AND ORDER

This matter comes before the Court on Defendants' Motion to Dismiss for lack of subject-matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.[1] ECF 30.

In this action, Plaintiffs, various environmental groups in Oregon, bring an environmental challenge to Defendants Department of Homeland Security ("DHS") and former-Acting Secretary Chad Wolf's ("Wolf") decision in July 2020 to send additional law enforcement personnel to Portland, Oregon to quell violent criminal activity, provide assistance to outnumbered officials already present, and protect federal property, without conducting an analysis on the environmental impact of doing so. Plaintiffs contend that under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, Defendants were required to undertake some environmental analysis of that decision.

In their Motion to Dismiss, Defendants assert that this Court does not have jurisdiction over Plaintiffs' claim because Plaintiffs fail to allege a "final agency action," which is required for judicial review under the Administrative Procedures Act ("APA"). *See, e.g.,* ECF 30 at 10,

---

[1] Plaintiffs also move under Rule 12(f) to strike Exhibits 1, 2, and 3 to Defendants' Motion to Dismiss as immaterial and impertinent. ECF 34. Exhibit 1 is DHS's Use of Force Policy, Exhibit 2 is DHS's First Amendment Policy, and Exhibit 3 is a declaration by Mr. Gabriel Russell, Regional Director of the Federal Protective Service (FPS) and commander of the U.S. Department of Homeland Security (DHS) Rapid Deployment Force for Operation Diligent Valor in Portland, Oregon. ECF 30-1; ECF 30-2; ECF 30-3. Courts generally deny Rule 12(f) motions "unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action. Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." § 1382 Motion to Strike—Redundant, Immaterial, Impertinent, or Scandalous Matter, 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed.) (footnotes omitted). The exhibits arguably have some logical connection to Defendants' jurisdictional argument. This Court will resolve its doubts on this issue in favor of the non-moving party, Defendants, and accordingly denies Plaintiffs' Motion to Strike, ECF 34. This Court considers the challenged exhibits solely for Defendants' jurisdictional challenge.

PAGE 2 – OPINION AND ORDER

28-31; ECF 47 at 11-13. Defendants assert in the alternative that this case must be dismissed because Plaintiffs fail to present a cognizable theory of liability under NEPA.[2] ECF 30 at 19. This Court held a hearing on July 30, 2021.

For the following reasons, this Court concludes that Plaintiffs do not challenge final agency action within the meaning of the APA. Accordingly, this Court does not have jurisdiction. Even assuming there is jurisdiction, this Court finds that Plaintiffs do not state a claim for relief because the conduct challenged here falls into NEPA's exception for criminal enforcement actions. Defendants' Motion, ECF 30, is granted, and this matter is dismissed without prejudice.

## BACKGROUND

Beginning in May 2020, there were daily demonstrations and protests in downtown Portland in support of racial justice and criminal justice reform. Alongside peaceful protesters, other individuals damaged federal and other property and threatened and injured federal law enforcement officers charged with protecting local federal properties and personnel. ECF 30-3 at ¶¶ 4-6.[3] The Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the U.S. Immigration and Customs Enforcement (ICE) Building,

---

[2] In their briefing, Defendants also argued that Plaintiffs lack Article III standing and that the case is moot. At the hearing, counsel for Defendants stated that they are no longer arguing those grounds at the Rule 12 stage but reserve the right to raise these grounds later, should the case proceed to the Rule 56 stage. Accordingly, this Court does not address standing and mootness for purposes of this Rule 12 challenge.

[3] ECF 30-3 is a declaration provided by Defendants from Mr. Gabriel Russell, Regional Director of the Federal Protective Service (FPS) and commander of the U.S. Department of Homeland Security (DHS) Rapid Deployment Force for Operation Diligent Valor in Portland, Oregon. ECF 30-3 at ¶ 2.

and the Edith Green Wendall Wyatt Federal Office Building were the target of nightly vandalism, destruction of property, looting, arson, and assault. *Id*. at ¶ 4.

On June 26, 2020, former President Trump issued Executive Order No. 13933, which stated in relevant part as follows:

> Sec. 5. Providing Assistance for the Protection of Federal Monuments, Memorials, Statues, and Property. Upon the request of the Secretary of the Interior, the Secretary of Homeland Security, or the Administrator of General Services, the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security shall provide, as appropriate and consistent with applicable law, personnel to assist with the protection of Federal monuments, memorials, statues, or property. This section shall terminate 6 months from the date of this order unless extended by the President.

Exec. Order No. 13933, Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence, 85 Fed. Reg. 40081 § 5 (Jun. 26, 2020) ("Exec. Order 13933"); ECF 1 at ¶¶ 50-51. In response to the Executive Order, DHS and Wolf created the Protecting American Communities Task Force (PACT) to "coordinate Departmental law enforcement agency assets in protecting our nation's historic monuments, memorials, statues, and federal facilities." ECF 1 at ¶ 52. The agency's PACT announcement press release stated that there "may" be "potential surge activity to ensure the continuing protection of critical locations." DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues, https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect-american-monuments-memorials-and-statues (last visited August 31, 2021) ("DHS Pact Announcement"); ECF 35 at 23 n.6. The statement announced partnerships with other federal agencies "to establish information and intelligence sharing" and noted that Wolf "directed the deployment and pre-positioning of Rapid Deployment Teams (RDT) across the country to respond to potential threats to facilities and property. . . . While the [DHS] respects every American's right to protest peacefully, violence and civil unrest will not be tolerated." *Id*.

PAGE 4 – OPINION AND ORDER

In response to the increase in assaults on federal law enforcement officers and damage to federal property, beginning on or around July 4, 2020, Wolf and DHS deployed approximately 114 law enforcement personnel to Portland. ECF 1 at ¶ 53; ECF 30-3 at ¶¶ 8-9. This operational deployment, designated Operation Diligent Valor, was undertaken pursuant to DHS's law enforcement authority in 40 U.S.C. § 1315. To safely disperse crowds that posed a threat and to repel violent attacks, DHS used various Riot Control Agents (RCAs), including pepper spray. ECF 30-3 at ¶ 8. DHS took these actions to protect federal officers, the public, and federal facilities; to prevent violent individuals from gaining access to the secured areas of the Courthouse; and to deescalate the situation in Portland. The nightly violence continued to intensify between July 4 and July 30, 2020. *Id*. at ¶ 10. During the month of July 2020, DHS law enforcement officers arrested fifty-one individuals for assault on federal officers, three individuals for destruction of government property, and four individuals for arson. *Id*. at ¶ 11.

After July 2020, the violence was sporadic. And on July 29, 2020, senior DHS officials met with the Oregon Governor to work out an agreement whereby the Oregon State Police would take over crowd control and law enforcement in the area surrounding the Hatfield Courthouse, allowing federal law enforcement to limit their presence to the Courthouse and its grounds. After the agreement took effect, most of the protests occurred away from the Hatfield Courthouse and other federal buildings. The presence of federal law enforcement officers over and above those that are normally assigned to Hatfield Courthouse decreased significantly after July 2020. Since the end of July 2020, federal law enforcement officers have used RCAs only three times in response to sporadic violence. *Id*. at ¶¶ 12-13.

Plaintiffs filed this lawsuit on October 20, 2020, contending that before or after carrying out Operation Diligent Valor, Defendants were required by the National Environmental Policy

PAGE 5 – OPINION AND ORDER

Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., to conduct an environmental impact analysis. ECF 1. Plaintiffs allege that since their arrival in Portland under Operation Diligent Valor, Defendants "subject[ed] people at or near the protests to a vast arsenal of weapons including but not limited to rubber bullets, tear gas and other chemical munitions, impact munitions, marking munitions, rubber ball blast devices, flash bangs, baton strikes, a long-range acoustic device, and other military-style weapons and tactics." *Id*. at ¶ 5. Plaintiffs allege that through the munitions, Defendants have negatively impacted human and environmental health. They seek a declaration that Defendants failed to perform their legal duties under NEPA, the APA, and their implementing regulations, as well as a nationwide injunction to prohibit Defendants and their agents from "deploying tear gas and other munitions" unless and until an environmental analysis has been conducted. ECF 1 at 26. Plaintiffs also seek reasonable attorney fees, costs, and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. *Id*.

On January 8, 2021, Defendants filed this motion to dismiss. ECF 30. Defendants bring their motion to dismiss under both Rule 12(b)(1), asserting lack of subject matter jurisdiction, and Rule 12(b)(6), asserting failure to state a claim.

## LEGAL STANDARDS

### A. Background on NEPA

Plaintiffs' substantive claim arises under NEPA. The "twin aims" of NEPA are to require federal agencies "to consider every significant aspect of the environmental impact of a proposed action," and to ensure that agencies "will inform the public that it has indeed considered environmental concerns in its decision[-]making process." *Kern v. U.S. Bureau of Land Mgmt*., 284 F.3d 1062, 1066 (9th Cir. 2002) (quotation marks and citation omitted). NEPA is a procedural statute that "require[s] agencies to take a 'hard look' at environmental consequences"; it "does not contain substantive environmental standards." *Id*. (quotation marks and citations

PAGE 6 – OPINION AND ORDER

omitted). "Even where an agency determines that there will be 'adverse environmental effects of the proposed action,' the agency may still 'decid[e] that other values outweigh the environmental costs.'" *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, No. 20-55777, 2021 WL 3027687, at *2 (9th Cir. July 19, 2021) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (alterations in original).

NEPA established a Council on Environmental Quality ("CEQ") to promulgate regulations implementing NEPA's statutory requirements. 42 U.S.C. §§ 4332(2)(B), (C), (I); 4342; 4344; 40 C.F.R. parts 1500–1508 ("CEQ regulations"). Under CEQ regulations, agencies must prepare an Environmental Assessment ("EA") for qualifying federal actions and/or the more intensive Environmental Impact Statement ("EIS").

First, the agency must assess the appropriate level of NEPA review. "NEPA requires all federal agencies to 'include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment' a 'detailed statement' known as an 'environmental impact statement' (EIS)." *Whitewater*, 2021 WL 3027687, at *2 (quoting 42 U.S.C. § 4332(2)(C)). "If it is clear that an EIS must be prepared, the agency should proceed with the EIS." *Whitewater*, 2021 WL 3027687, at *3 (citing 40 C.F.R. § 1501.4(a)(1) (2017)).[4] An EIS addresses "the environmental impact of the proposed action"; "any adverse environmental effects which cannot be avoided"; "alternatives to the

---

[4] *Whitewater* referred to the 2017 version of the CEQ regulations and noted that the regulations had been "revised substantially" effective September 14, 2020. *Whitewater*, 2021 WL 3027687, at *3 n.1 (citing Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020)). Plaintiffs and Defendants did not suggest that this Court's analysis should change due to these revisions.

PAGE 7 – OPINION AND ORDER

proposed action"; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of resources which would be involved in the proposed action." 42 U.S.C. § 4332(2)(C)(i)–(v). If it is not clear that an EIS is required, "the agency may prepare an 'environmental assessment' (EA)—which is a 'concise public document'—to determine whether a proposed action requires an EIS. If, after preparing an EA, the agency determines that an EIS is not required, the agency then may issue a '[f]inding of no significant impact' (FONSI)." *Whitewater*, 2021 WL 3027687, at *3 (internal citations omitted).

CEQ regulations also permit an agency to determine ahead of time "a category of actions" that will not "individually or cumulatively have a significant effect on the human environment," and "for which, therefore, neither an [EA] nor an [EIS] is required." 40 C.F.R. § 1508.4 (2017). These categories of actions are commonly called "CATEXs." Federal agencies must "'integrate the NEPA process with other planning at the earliest possible time.'" *Whitewater*, 2021 WL 3027687, at *3 (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979)).

### B. NEPA and the APA

NEPA does not contain provisions allowing a right of action. Accordingly, a plaintiff seeking to challenge an agency action under NEPA must do so under the APA. *Cf. ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998) (citation omitted). The plaintiff must therefore satisfy the jurisdictional requirements of an APA suit; that is, the plaintiff must challenge a "final" "agency action." *ONRC*, 150 F.3d at 1135 (citation omitted). If a plaintiff does not challenge a final agency action within the meaning of the APA, a federal court lacks subject matter jurisdiction to hear the NEPA claim.

# DISCUSSION

The Court evaluates Defendants' arguments in turn.

### A. This Court does not have jurisdiction because Plaintiffs do not challenge "final agency action" as required under the APA

Defendants argue that Plaintiffs do not challenge final agency action as required for this Court to exercise jurisdiction under the APA. Defendants bring a factual Rule 12(b)(1) attack.[5] When evaluating such an attack, "a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment. It also need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (internal citations omitted). Where a Rule 12(b)(1) motion relies on evidence properly before the court to "attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency," then the plaintiff must present evidence "necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

To obtain review under the APA, Plaintiffs must show that they have been affected by some "agency action" covered by the Act. 5 U.S.C. § 702. "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13). Plaintiffs must also demonstrate that the challenged action is reviewable "final agency action" under Section 704 of the APA. *Id*. § 704; *see also*

---

[5] Defendants offer three exhibits "to show that the use of force is routine law enforcement activity that falls" outside the APA's definitions of agency action and final agency action. ECF 46 at 5-6. Accordingly, Defendants assert a factual challenge. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (finding jurisdictional attack to be factual because defendants "challenged [plaintiff's] contention that grass residue constitutes solid waste under RCRA"); *id*. (explaining that a jurisdictional challenge is a factual attack where it "relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings") (citing *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n. 5 (11th Cir. 2003)).

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1247 (D. Mont. 2005) ("*FSEEE*") ("Because NEPA does not have a citizen suit provision, there must be final agency action for this Court to have statutory jurisdiction under the APA.").

Under the *Bennett* test articulated by the Supreme Court, an "agency action is 'final' when (1) the agency reaches the 'consummation' of its decision[-]making process and (2) the action determines the 'rights and obligations' of the parties or is one from which 'legal consequences will flow.'" *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1103 (9th Cir. 2007) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1970)). In evaluating finality, a court should "focus on the practical and legal effects of the agency action: [T]he finality element must be interpreted in a pragmatic and flexible manner." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citations and quotation marks omitted) (alteration in original).

### i. No consummation of agency's decision-making process

Plaintiffs clarified at the hearing on this motion that they challenge two alleged final agency actions: (1) a failure to act (*i.e.*, the failure to do a NEPA review when one is required), and (2) Operation Diligent Valor, which Plaintiffs characterize as DHS's planned mission to deploy personnel to quell protests using large volumes of chemical and other munitions. Under the first prong of *Bennett*, final action must be a "definitive statement of the [agency's] position," *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990), or the agency's "last word on the matter" at issue, *Oregon Nat. Desert Ass'n*, 465 F.3d at 983, 984. Agency action that is "merely tentative or interlocutory" in nature is not final agency action. *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 577 (9th Cir. 2019) (quotation marks and citations omitted).

The first prong of *Bennett* is not satisfied here because the implementation of Operation Diligent Valor was not the consummation of any agency decision-making process. Rather, the agency decision to send emergency reinforcements and resources to a hotspot is a temporary, tentative action taken pursuant to a broad program of assisting federal personnel. It was also taken pursuant to DHS's existing statutory authority to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government," 40 U.S.C. § 1315(a); it did not emanate from a separate decision.

The decision to send reinforcement personnel to Portland did not represent any definitive statement or final position by the agency, or its "last word" on any issue. The Russell Declaration makes clear that Operation Diligent Valor constituted a temporary infusion of law enforcement officials to assist overwhelmed officials on the ground. Plaintiffs have not pointed to any policy that suggests DHS intended or expected to set up a lasting operation in Portland, let alone an operation that would use significant amounts of tear gas and other munitions that might cause environmental harm. And while Plaintiffs claim that Operation Diligent Valor included a planned policy to use munitions on peaceful people gathered near federal properties, the record does not support this reading. Notably, neither Executive Order 13933 nor the PACT press release, relied upon by Plaintiffs in their Complaint as the order or universe of orders from which "Operation Diligent Valor" was established, mention tear gas or any munitions whatsoever. *See* ECF 1 at ¶¶ 51-52; Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence, Executive Order 13933 (85 Fed. Reg. 40081-40084 (June 26, 2020)); ECF 35 at 23 n.6 (referencing DHS PACT Announcement). These documents focus on the purpose of responding to criminal activity and to threats to people and property. At most, the DHS press release notes that while DHS "respects every American's right to protest peacefully,

violence and civil unrest will not be tolerated." DHS PACT Announcement. Seeking to respond to violence and civil unrest does not evince a policy of quelling peaceful protests with chemical and other munitions.

The interlocutory nature of this infusion of law enforcement personnel is further established by the prompt reduction of the presence of those personnel. On July 29, 2020, senior DHS officials met with the Oregon Governor to work out an agreement whereby the Oregon State Police would take over crowd control and law enforcement in the area surrounding the Hatfield Courthouse, allowing federal law enforcement to limit their presence to the Courthouse and its grounds. ECF 30-3 at ¶ 12. After July 2020, federal law enforcement officers have only used RCAs three times, and the presence of federal law enforcement officers over and above those normally assigned to Hatfield Courthouse "decreased significantly." *Id*. at ¶ 13. From the outset of this temporary personnel infusion, the record demonstrates the agency was ready and willing to change its mind as to its presence and react to developments on the ground. This demonstrates that the decision to send reinforcements to respond to a dynamic situation was not final agency action. *Cf. FSEEE*, 397 F. Supp. 2d at 1252 (finding *Bennett* prong one satisfied where "the agency does not intend to change its mind"). Indeed, the apparent goal of sending these reinforcements was to calm the situation and prevent further criminal activity from occurring, thereby foreclosing any need to use munitions at all. *See* ECF 30-3 at ¶¶ 8-9 (Russell Declaration averring that Operation Diligent Valor was undertaken to address violence and "to deescalate the situation in Portland").

Further, the decision to send reinforcements to a temporary hotspot to carry out law enforcement functions has no foreseeable environmental impact that might suggest that a NEPA analysis is appropriate. Plaintiffs rely on *FSEEE* in arguing that Operation Diligent Valor

constitutes final agency action, but that case is distinguishable. In that case, the court permitted a challenge to the United States Forest Service's national "decision to allow the use of chemical fire retardant to fight fires on national forests, without conducting a NEPA analysis." *FSEEE*, 397 F. Supp. 2d at 1248. The Forest Service effectively had a policy to use chemical fire retardant to fight fires: The agency recognized that chemical fire retardant was an "important tool in the USFS toolbox," had guidance for its use, had an "aggressive policy to suppress all fires," and used "an average of 15 million gallons of fire retardant annually, though as many as 40 million gallons" in some years. *Id*. at 1244, 1251. Additionally, the Forest Service had "previously recognized the need to conduct NEPA analysis concerning the use of chemical fire retardant on national forests," and explicitly decided to authorize chemical fire retardant usage without consulting NEPA. *Id.* at 1246, 1248, 1250-51. In contrast, in this case Plaintiffs challenge the emergency decision to deploy law enforcement officials to provide reinforcements to assist in responding to violent criminal activity. Unlike in *FSEEE*, as explained above, the actions here were tentative and interlocutory,[6] and there was no reason for DHS officials to believe that their decision to send reinforcement personnel to a hotspot to respond to violent criminal activity would have a significant environmental impact. Moreover, to the extent that violent behavior subsided, the additional law enforcement officers deployed would have no need to use tear gas or any other munitions.

In addition to being interlocutory and tentative, Defendants' sending of reinforcements to assist other officers was part of a routine reallocation of resources authorized by 40 U.S.C. § 1315, rather than some separate policy or final decision. *Cf. Am. C.L. Union v. Nat'l Sec.*

---

[6] Because there was no predicate final agency action, Plaintiffs' "failure to act" claim also fails because the agency did not "fail" to "take a discrete agency action that it is required to take." *See FSEEE*, 397 F. Supp. 2d at 1250 (emphasis omitted).

PAGE 13 – OPINION AND ORDER

*Agency*, 493 F.3d 644, 678–79 (6th Cir. 2007) (holding that "NSA's warrantless interception of overseas communications" and other actions were merely "generalized conduct" "given a label for purposes of abbreviated reference," and not agency action). Plaintiffs effectively bring a broad programmatic challenge to the DHS's allocation of additional resources in emergency situations. Such challenges are impermissible under the APA and infringe upon the separation of powers inherent in our constitutional system. "Consistent with the cases or controversies requirement, the APA does not give federal courts general supervisory authority over executive agencies, but only over cases in which '[a] person [has] suffer[ed] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action.'" *Whitewater*, 2021 WL 3027687, at *8 (quoting 5 U.S.C. § 702) (alterations in original). "[S]ystemic challenges, seeking *wholesale* improvement by court decree" are "properly matters that should be pursued [in Washington], where programmatic improvements are normally made." *Id*. (emphasis in original) (citation, ellipses, and quotation marks omitted). The Court notes that Plaintiffs' Complaint describes their efforts to avail themselves of political vehicles, which are a more appropriate mechanism for the wholesale changes they seek. *See, e.g.,* ECF 1 at ¶¶ 70-72, 115-121.

In sum, the challenged actions here are routine, temporary, tentative, and responsive to the actions of others. Operation Diligent Valor accordingly does not represent the agency's final position in any sense, and this Court does not have jurisdiction to evaluate it; there is no "unconditioned authority to determine the constitutionality of legislative or executive acts." *Whitewater*, 2021 WL 3027687, at *8 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471 (1982)) (quotation marks omitted).

> ii. **Implementing Operation Diligent Valor did not determine the 'rights and obligations' of the parties, nor was it a decision from which 'legal consequences will flow'**

PAGE 14 – OPINION AND ORDER

The second *Bennett* factor is also not satisfied. This factor may be satisfied by "several avenues," including where administrative orders "impose an obligation, deny a right, or fix *some* legal relationship as a consummation of the administrative process." *Oregon Nat. Desert Ass'n*, 465 F.3d at 986–87 (quotation marks and citations omitted) (emphasis in original). An agency action may be final if it has a "direct and immediate" effect on "the day-to-day business" of the subject party; courts consider whether the action has the "status of law or comparable legal force, and whether immediate compliance with its terms is expected." *Id*. at 987 (quotation marks and citations omitted). Again, a court should "focus on the practical and legal effects of the agency action" and interpret finality "in a pragmatic and flexible manner." *Id.* at 982 (citations and quotation marks omitted).

DHS's implementation of Operation Diligent Valor in Portland did not "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Id.* at 986–87 (emphasis omitted). The Russell Declaration and the Executive Order relied upon in Plaintiff's Complaint demonstrate that the intention in implementing this reinforcement operation was not to send officials to Portland to use tear gas on people. There is no legal consequence to people from sending reinforcement law enforcement officials to a hotspot to protect outnumbered officials and federal buildings from criminal behavior.

### B. Assuming this Court has jurisdiction, Plaintiffs fail to state a claim because the conduct challenged falls into NEPA's exception for criminal enforcement actions

Assuming Plaintiffs establish APA jurisdiction, Defendants argue that this action must be dismissed on the merits under Rule 12(b)(6) because the challenged actions fall within NEPA's exception for criminal enforcement actions. ECF 30 at 28; ECF 47 at 18–21.[7] That exception

---

[7] For purposes of this argument, this Court does not consider Defendants' provided exhibits, which are relevant and admissible only on jurisdictional questions.

PAGE 15 – OPINION AND ORDER

provides that "Major Federal action" subject to NEPA review "does not include" certain "activities or decisions," such as "[j]udicial or administrative civil or criminal enforcement actions." 40 C.F.R. § 1508.1(q)(1), (1)(iv).

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. S*hroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845

F.3d 984, 988 (9th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

Plaintiffs argue the decision to send law enforcement reinforcements to Portland "falls plainly outside of this [criminal enforcement] exemption" because it was not "mere enforcement" but rather a "novel deployment of federal personnel and resources in place of traditional state and local actors." ECF 35 at 34-35. Plaintiffs also argue that the criminal enforcement exception applies to longstanding enforcement actions rather than new ones, *id.*, and suggest that the exception is meant to address the investigation or prosecution of a specific, targeted enforcement action rather than generalized crowd control. Plaintiffs have not offered any persuasive legal authority to support their assertion that sending additional law enforcement officers to address criminal activity on a temporary basis to prevent crime and enforce criminal laws is not a "criminal enforcement action." Plaintiffs rely on general language in the DHS Instruction Manual and arguments concerning the CEQ regulations' legislative history and text. *See, e.g.,* ECF 35 at 34; Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA) ("DHS Instruction Manual"); July 30, 2021 hearing transcript. Defendants argue that NEPA's criminal enforcement exception is broad, yet also more specific and applicable here than the general provisions in the Manual cited by Plaintiffs. *See* ECF 30 at 14, 31–32; ECF 47 at 19–21.

The plain text of the CEQ regulations supports Defendants' reading. The regulations clearly except from NEPA's requirements "[j]udicial or administrative civil or criminal enforcement actions." 40 C.F.R. § 1508.1(q)(1), (1)(iv). As for the DHS Instruction Manual, the Manual has no explicit category that fits the facts of this case. Plaintiffs shift between emphasizing the Manual's "emergency" procedures, which apply when the agency responds to

PAGE 17 – OPINION AND ORDER

"natural or man-made disaster[s] or other phenomen[a] of an exceptional, inevitable, and irresistible character," DHS Instruction Manual at II-2–II-3, and emphasizing the Manual's provisions for more longstanding, environmentally significant operations, ECF 35 at 32, 35-36. Where even Plaintiffs are uncertain as to the Manual's import to this case, these arguments do not override the clear regulatory text, which provides that criminal enforcement actions are exempt from NEPA. Further, Plaintiffs' "interpretation of the applicability of NEPA would lead to a highly impractical result in which any decision of a law enforcement agency—whether to go forward with an action or forbear from action—would require a NEPA analysis." *United States v. Glenn-Colusa Irr. Dist.*, 788 F. Supp. 1126, 1135 (E.D. Cal. 1992).

In sum, the decision to send reinforcement personnel to a temporary hotspot to respond to criminal activity, protect people and property from criminal activity, and enforce criminal laws, falls within NEPA's exception for criminal enforcement actions. Accordingly, even assuming this Court has jurisdiction, this Court finds that Plaintiffs have not stated a claim for relief.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF 30, is GRANTED, and this case is dismissed without prejudice. *See Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017) (explaining that dismissals for lack of subject-matter jurisdiction must be without prejudice).

**IT IS SO ORDERED**.

DATED this 3rd day of August, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge